Phil Telfeyan (CA Bar No. 258270)
Equal Justice Under Law
400 7th Street NW, Suite 602
Washington DC 20004
ptelfeyan@equaljusticeunderlaw.org
202-505-2058

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

_____

|  |  |
|---|---|
| WILLIAM EDWARDS, ROBERT JACKSON, JAMES BROOKS, and KYSER WILSON on behalf of themselves and others similarly situated, | ) ) ) ) ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| LEADERS IN COMMUNITY ALTERNATIVES, INC., SUPERCOM, INC., LINDA CONNELLY, DIANE HARRINGTON, KENT BOROWICK, RAELENE RIVAS, JEANETTE ARGUELLO-RAMOS, BELINDA DOE, DOES 1–10, inclusive, | ) ) ) ) ) ) ) |
|  | ) |
| ALAMEDA COUNTY, WYNNE CARVILL, and WENDY STILL, | ) ) ) |
|  | ) |
| Defendants. | ) ) |

Case No. 4:18-cv-4609

CLASS ACTION

**JURY DEMANDED**

_____

## COMPLAINT

### Introduction

1.      This case is about Alameda County allowing a private company — Leaders in

Community Alternatives ("LCA") — to extort money from poor Californians.  Alameda County

has contracted with LCA to provide court-ordered GPS and alcohol tracking devices for

Complaint                                          1

individuals on pre-trial or home detention.  In reality, this means LCA attaches one or more devices that can weigh nearly a pound to an individual's ankle and then imposes a daily fee for this "monitoring service."  Alameda County pays nothing; the cost is instead placed on Class Members, many of whom are unable to pay the hundreds of dollars a month that LCA demands. Because only LCA has the power to remove the devices, they are in essence high-tech shackles.

2.     Alameda County has looked the other way while LCA has demanded $25.50 per day — $765 per month, or $9,180 per year — from low-income individuals sentenced to wear its devices, despite California law requiring that individuals not be charged more than they are able to pay.  When individuals sentenced to LCA tracking fall behind on making payments they cannot afford, LCA staff threatens to inform the court they are violating their release conditions. Under this pay-or-jail scheme, an alternative to incarceration masks a form of extortion: pay what is demanded or end up in a jail cell.  The Named Plaintiffs in this action have given up their homes and borrowed money from family and friends to keep up with payments and avoid returning to jail. Since Class Members are often offered home detention to accommodate special circumstances (one of the Named Plaintiffs requires chemotherapy and another is the sole caretaker for his bed-ridden mother), they are in a particularly vulnerable position — remand to jail could have catastrophic results.

3.     This civil rights action is brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the United States Constitution's Due Process and Equal Protection Clauses, federal law (42 U.S.C. § 1983), and California law to stop the Defendants from continuing to operate a racketeering enterprise that is extorting money from some of the most impoverished people in Alameda County.

**Nature of the Action**

4.      Alameda County and LCA entered into a contract, effective July 31, 2013, under which either the Superior Court or the Probation Department can refer people to LCA to have a GPS tracking device and/or alcohol monitor attached to their bodies.  Ex. 1, Alameda County Agreement with LCA.  Under the terms of the agreement, LCA is responsible for tracking people in the program 24 hours per day, seven days a week; providing the necessary equipment (radio frequency tracking, GPS, or alcohol monitoring); and immediately reporting any "non-compliance events." *Id.*

5.      In exchange, the County allows LCA to charge individuals assigned to them "fees."  Exhibit B of the contract states that it is up to LCA to make the program financially viable for itself.  The County is not obligated to help LCA collect its money.  Instead, the "Electronic Monitoring Program will be completely participant-funded and neither the Probation Department nor the County will have any financial responsibility for this Program." *Id.*

6.      Rather than paying the costs of enforcing the law, Alameda County instead passes those costs, which amount to $765 a month, onto the very people targeted by its system — many of whom are indigent and all of whom are already struggling with the consequences of being accused or convicted of a crime.  This user-funded model allows the County to shirk its financial responsibility and place an unlawful and coercive burden upon indigent individuals.  LCA gives them a false choice between unaffordable payment or jail, extorting money from individuals desperate to keep their jobs and care for their families.

7.      The enterprise between Alameda County and LCA means that a supposedly neutral contractor with profit incentives decides how much it is going to charge for a government function and the tactics it will use to extract money from Class Members, many of whom have insufficient means to pay the daily price tag attached to this alternative to jail.

8.    LCA interprets the contract as giving it freedom to decide how much money it thinks it can make off of every Class Member and then to exert whatever pressure it wants to get the person to meet LCA's financial demands.  If the person does not have the ability to pay, LCA "violates" that individual, potentially resulting in his or her return to jail and scaring other Class Members in the program into giving into LCA's demands for payment, no matter how onerous.

9.    The American legal system has long relied on neutral court and law enforcement officials, such a pre-trial services staff, probation officers, or court clerks who, as employees, are charged with working with individuals within the criminal justice system to comply with all court orders and restrictions.  These public servants have no incentive to revoke an individual's terms of release other than to fulfill a duty to uphold the law.

10.    In contrast, LCA has no obligation to protect public safety, prevent recidivism, or better the community.  Instead, it has a direct financial stake in each person who comes through its doors and a commitment to make as much money as possible for its parent company SuperCom, Inc.'s shareholders.  LCA has therefore executed its contract with Alameda in a way that violates the basic notions of due process, neutrality, and fairness in its quest for profits.

11.    LCA begins by assigning everyone a daily rate of $25.50 or more when they are first booked into the GPS tracking program.  LCA staff then erect a series of barriers for anyone who tries to get that amount reduced.

12.    LCA has an obligation, which it ignores, to inform people sentenced to wear its devices that they must only pay what they can afford and threatens to have them sent back to jail if they do not pay, in violation of California law that states, "No person shall be denied consideration for, or be removed from, participation in any of the programs to which this section applies because of an inability to pay all or a portion of the program supervision fees." Cal Code

Complaint                                              4

1208.2(g).

13.     In order to justify charging high rates, LCA bases its assessment of how much to charge on "household income," regardless of whether there is a legal relationship between individuals in the household or not.  LCA thus intentionally deceives participants into thinking that their household's income, rather than the participant's income, is the determining factor of a participant's ability to pay, directly contradicting California statute.  Cal. Code 1208.2(e) (defining ability to pay based on "the person's" financial situation); Ex. 2, Edwards Financial Needs Assessment Form.

14.     LCA intentionally fails to tell participants that they have the right to have a judge determine how much they can afford to pay while in its monitoring programs.  *Compare* Cal Code. 1208.2(h) (providing for a judge to resolve ability to pay disputes) *with* Ex. 3, LCA Client Handbook, Rev 2014 at 3; Ex. 4, LCA Client Handbook, Rev 2016 at 5 (failing to mention the right to seek daily rate reduction from the court).

15.     LCA intentionally misleads participants into thinking that they must try to "come to an agreement with LCA regarding the terms of payment" before exercising their right to have a judge assess their ability to pay.

16.     LCA makes the agreement process intentionally burdensome and slow so participants will be forced to pay them at a higher rate they cannot afford for as long as possible.

17.     Even when an individual is able to complete the burdensome paperwork to prove their indigence, LCA stalls by claiming that the papers are not in their proper form.  Once it cannot find any more excuses for delay, it lowers the daily rate by a trivial amount, again starting the cycle of bureaucracy for obtaining a further reduction in fees.

18.     If individuals sentenced to wear LCA shackles do not disclose all the details of

their finances or if they are late in submitting a payment, LCA threatens to "violate" them by reporting to the Sheriff or the Court that they are not in compliance with the terms of their release.  They tell these individuals that if they are "violated," they will be dropped from the program and sent to jail.

19.     In short, failure to pay an extortionate amount to a private company — or even provide financial records quickly enough — can result in someone being sent to jail.  This can be disastrous, resulting in job loss, disruptions to family integrity, and inability to obtain crucial medical care.

20.     LCA is not concerned with a tracked individual's actual ability to pay the exorbitant fees it charges.  Rather, it automatically charges every Class Member subject to wearing a GPS device $25.50 per day — a fee that accrues daily and quickly becomes debilitating for indigent individuals.  LCA's pay-or-jail scheme also places the burden on those shackled individuals to prove that paying LCA's price is not feasible.

21.     LCA receives no payment from Alameda County to provide GPS tracking; it relies solely on fees extracted from individuals sentenced to GPS tracking to cover its costs and make a profit.  Therefore, every reduction in the daily rate a person must pay affects LCA's bottom line.  As a for-profit entity, LCA does everything it can to prevent loss of income from lowered daily fees.

22.     In addition to the human suffering of individual Class Members caught in LCA's pay-or-jail extortion scheme, the entire community is harmed when individuals are returned to jail simply for being poor.  The costs of jailing people and of social services to support the families left behind inevitably go up, transferring the burden to Alameda County taxpayers to provide LCA's profit margin.

23.     LCA and the County have conspired to enforce their pay-or-jail scheme by sending individuals who cannot pay enough to satisfy LCA to jail as a warning to other non-payers.  This tactic coerces the others into begging and borrowing from family and friends to add to LCA's profits from this illegal scheme.

24.     The treatment of the Named Plaintiffs was caused by and is representative of the policies and practices employed by the County and LCA to subject Class Members to electronic monitoring so that they can be charged whatever fees LCA sees fit to collect.

25.     The Plaintiffs seek declaratory, injunctive, compensatory, and punitive relief for themselves and all others similarly situated.

26.     Plaintiffs are entitled to an injunction from this Court to stop LCA from continuing its illegal fee extortion scheme because they are reasonably likely to be sentenced to additional time on an LCA monitor and therefore be subject to LCA's illegal activities once again.

27.     Plaintiff Robert Jackson has an open case for Driving Under the Influence and is reasonably likely to be sentenced to additional time on a LCA monitor if he cannot pay for the Sheriff's Work Alternative Program (SWAP).

28.     Mr. Jackson is on probation until June 8, 2021 and is reasonably likely to be sentenced to LCA should he be found in violation of the terms of his probation.

29.     Plaintiff James Brooks is on probation until November 7, 2022 and is reasonably likely to be sentenced to LCA should he be found to be in violation of the terms of his probation.

30.     Mr. Brooks is still making payments on the bond because he had to submit to LCA's demands for payment based on a daily rate he could not afford. Failure to make those payments is reasonably likely to result in legal action against him.  Ex. 5, Declaration of James

Brooks.

31.     Plaintiff Kyser Wilson is on probation until July 29, 2021 and is reasonably likely to be sentenced to LCA should he be found to be in violation of the terms of his probation.

32.     Mr. Wilson is also unable to pay his restitution and is subject to court action, including charges of contempt, because he was forced to submit to LCA's demands for money, thus leaving him nothing to satisfy his other court debt.  Ex. 6, Declaration of Kyser Wilson.

33.     Mr. Wilson does not have a valid driver's license because he owes court debt.  If he has to drive with a suspended license due to an emergency, it is reasonably likely he could be stopped by the police and be subject to prosecution that would end with an additional sentence of LCA monitoring.

34.     By failing to supervise LCA properly, Alameda County has a policy of allowing LCA to extract as much money as possible from people under its control, allowing it to extort money from every individual who is placed under its supervision by the county.  Ex. 1.

35.     Plaintiffs are entitled to seek injunctive relief against LCA because LCA's conduct is ongoing and continuous and will continue to affect members of the class.

36.     Only individuals with relatively short sentences may be booked into LCA's program, resulting in supervision durations that are capable of repetition but evading review.

37.     LCA collects extensive financial information from individuals sentenced to wear high-tech shackles — which LCA euphemistically refers to as "electronic monitoring" — and thus knows if they are impoverished.  LCA nevertheless demands that these individuals obtain money from friends and relatives rather than lowering the cost of electronic shackling.  The Supreme Court has held on multiple occasions that a person cannot be jailed simply for being too poor to pay a fine or fee — yet LCA employees threaten Class Members with exactly that

consequence if they do not pay whatever fees LCA sees fit to demand.  This policy violates the Fourteenth Amendment, California law, and the terms of LCA's contract with Alameda County.

38.     By and through their attorneys and on behalf of themselves and all others similarly situated, the Named Plaintiffs William Edwards, Robert Jackson, James Brooks, and Kyser Wilson seek injunctive relief to protect the rights of all those ordered to wear GPS tracking devices and to end the practice of extorting money from indigent Class Members.  They also request compensation for the civil rights violations that they suffered, including punitive damages to deter similar misconduct in the future.

## Jurisdiction and Venue

39.     This is a civil rights action arising under 42 U.S.C. § 1983, 18 U.S.C. § 1964(c) (RICO), and 28 U.S.C. § 2201, et seq., and the Fourteenth Amendment to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  The Court has supplemental jurisdiction over the state law causes of action asserted in this Complaint pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as the federal law claims.

40.     In connection with the RICO claim, the ends of justice require that all the Defendants be summoned to the Northern District of California.  *See* 18 U.S.C.A. § 1965; *Butcher's Union Local No. 498, United Food & Commercial Workers v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986).  This Court has personal jurisdiction over the Defendants who are citizens of California.  There is no other district in which a court will have personal jurisdiction over all the alleged co-conspirators.

41.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## Intradistrict Assignment

42.     Because Alameda County is a Defendant and the majority of the actions challenged in this complaint occurred in Alameda County, jurisdiction is proper in the Oakland or San Francisco Division of the Northern District of California.  Civil L.R. 3-2(c)-(d).

## Parties

43.     Named Plaintiff William Edwards is a 38-year-old African-American who was subjected to LCA's GPS tracking program from January 9 to April 12, 2017.  Cal Code 1208.018 (pretrial terms of release).  At the time, he worked at the Contra Costa County Public Defender's office as a clerk, where he earned $16.77 per hour with no benefits, which is barely a living wage in Alameda County.[1]  Mr. Edwards's sole asset is a 2002 Buick Regal worth $600.  Ex. 2, Edwards Financial Needs Assessment Form.  Mr. Edwards also has cancer that requires frequent medical attention and daily chemotherapy.  He often must miss work to deal with his health issues, further reducing his subsistence income.  While on the tracking device, he paid LCA a total of $1,343.  Ex. 7, Edwards Equipment Return Form.

44.     Robert Jackson is a 38-year-old African-American widower raising three daughters.  In February 2017, he was given compassionate release from a 120-day jail sentence and ordered onto an LCA ankle monitor when his wife passed away suddenly.  Cal Code. 1208.016; Ex. 8, Jackson Minute Entry.  Although he worked as a forklift operator earning $400-500 a week, LCA charged him $250 per week, or 50-65% of his income, to fund his own monitoring.  Mr. Jackson paid LCA approximately $4,500 for 113 days of monitoring.  Ex. 9, Declaration of Robert Jackson.

45.     James Brooks is a 49-year-old African-American longshoreman who was unable to work at the time he was ordered to LCA monitoring because he was the sole caretaker for his

---

[1] http://livingwage.mit.edu/counties/06001

seriously ill mother.  Cal Code. 1208.016.  In order to make ends meet, he rented out his home and moved into his mother's apartment.  Their sole income was the rent (minus the mortgage payment) and his mother's social security and disability payments.  Despite his dire financial situation, LCA refused to lower Mr. Brooks' daily rate.  He paid LCA $1,629 for 58 days of GPS tracking.  Ex. 10, Brooks Enrollment Form.

46.     Kyser Wilson is a 40-year-old African-American who at the time he was on an LCA tether worked as a hotel desk clerk for $14 an hour and earned income on the side as a barber.  Cal Code. 1208.016; Ex. 11, Wilson Proof of Employment.  LCA charged him $650 per month, or approximately 30 percent of his gross income, for a GPS tracking device and an alcohol monitor.  Because of the amount of money LCA demanded, Mr. Wilson was unable to pay his other court debt, which has gone up nearly $1000 due to late fees and interest.  Mr. Wilson paid LCA a total of $2,100 for 90 days of monitoring.  Ex. 6, Declaration of Kyser Wilson.

47.     Defendant Leaders in Community Alternatives (LCA) is a California corporation that was founded in 1991.  Between January 2015 and October 2016, on average, 112 citizens of Alameda County were enrolled in LCA's monitoring programs on any given day.  Ex. 12, Statistics Power Point.

48.     Defendant SuperCom, Inc., is LCA's parent company, and is incorporated in Delaware and headquartered in New York City.  Ex. 13, SuperCom 20-F Form at 30.  It is responsible for the business activities in the United States of SuperCom, Ltd., a corporation headquartered in Hertzliya Pituach, Israel.

49.     SuperCom does business in California by leasing 1,200 square meters of office space for LCA's operations.  Ex. 13 at p. 30-31.

Complaint                                11

50.     SuperCom does business in California by supplying LCA with the equipment and software it uses for surveillance of individuals under court orders.

51.      SuperCom participates in management of LCA through Defendant Diane Harrington, who became Executive Director of LCA in 2017.  Ms. Harrington is listed as a "Key Employee" in SuperCom's F-20 and has been Director of Treatment at SuperCom, Inc. since 2014.  Ex. 13 at 41- 42.

52.     Defendant Linda Connelly is the Founder of LCA and was President and CEO of the company when the electronic monitoring contract with the County was signed.  Ms. Connelly was responsible for LCA's actions during the time of misconduct alleged in this case.

53.     Defendant Diane Harrington is the current Executive Director of LCA, having been promoted to that position in April 2017 from Director of Program Services.  In both capacities, she knew, or should have known, about LCA's illegal overcharging of indigent clients.

54.     Defendant Kent Borowick is the Chief Financial Officer and Chief Operating Officer of LCA.  He joined LCA in 2009 and is responsible for LCA's finances and has oversight of LCA's electronic monitoring program.  In that capacity, he knew, or should have known, about LCA's illegal overcharging of indigent clients.

55.     Defendant Raelene Rivas is the Senior Case Manager for LCA who handled Named Plaintiff William Edwards's case, among others.  In that capacity, Ms. Rivas was directly involved in LCA's illegal overcharging of indigent clients.

56.     Defendant Jeanette Arguello-Ramos is the case manager for LCA who handled Named Plaintiff James Brooks's case, among others.  In that capacity, Ms. Rivas was directly involved in LCA's illegal overcharging of indigent clients.

57.     Jane Doe is the case manager for LCA who handled Named Plaintiff Kyser Wilson's case, among others.  In that capacity, Jane Doe was directly involved in LCA's illegal overcharging of indigent clients.

58.     Defendant Belinda Doe (last name not currently known) is the case manager for LCA who handled Named Plaintiff Robert Jackson's case, among others.  In that capacity, Belinda Doe was directly involved in LCA's illegal overcharging of indigent clients.

59.     Defendants Jane or John Does 3-10 are case managers and other staff at LCA who made decisions that resulted in indigent Class Members being charged more than they could afford or violated indigent individuals because they could not afford to pay LCA's exorbitant rates.  The identity of these LCA employees will be revealed during discovery when Plaintiffs will request not only the records that LCA maintained on them, but information about how many Class Members LCA caused to be sent to jail for non-payment.

60.     Defendants Linda Connelly, Diane Harrington, Kent Borowick, Raelene Rivas, Jeanette Arguello-Ramos, Belinda Doe, and Jane or John Does 1-10 each used their discretion as case managers and supervisors to apply LCA policies and practices to determine how much money each Class Member owed, how much they were forced to pay, when to "violate" them, and every other discretionary decision discussed in this Complaint.  Together with LCA, these individual Defendants will occasionally be referred to as the "LCA Defendants."

61.     Defendant Alameda County is a local subdivision of the State of California and a body corporate organized and existing under the Constitution of the State of California.  Cal. Const. Art. IX § 1.  It is governed by a five-member Board of Supervisors.  Cal. Const. Art. IX § 4.

62.     Alameda County's Board of Supervisors created a program of home detention

under Cal. Code 1203.016 and 1203.018 on July 30, 2013. The Board of Supervisors approved the contract with LCA to provide electronic monitoring services on the same day, on the understanding that the program would have "NO increase in NET COUNTY COST." Ex. 14, Board of Supervisors Memo (capitalization in original).

63.     Defendant Wynne S. Carvill is the Presiding Judge of the Alameda County court and is responsible for the administration of the court, including overseeing financial expenditures. Cal. Rules of Court 10.603(a)(1). LCA provides services directly to the Superior Court of Alameda and thus the court has oversight responsibility to make sure that the contract is being executed according to its terms and the laws of California. *Id.* Judge Carvill is being sued in his policymaking and administrative capacity as the presiding judge of the Alameda County Court.

64.     Defendant Wendy Still is the Chief Probation Officer of Alameda County. Ms. Still entered into office on August 1, 2016 and is responsible for oversight of the contract for electronic monitoring with LCA that was signed by her predecessor, LaDonna Harris, in January 2013. Ms. Still is sued in her official capacity. Together with Alameda County, these individual Defendants will occasionally be referred to as "County Defendants."

65.     Under *Ex parte Young*, 209 U.S. 123 (1908), both the Chief Judge and the Chief Probation Officer of Alameda County may be sued in their official administrative capacities and can be enjoined from enforcing any unconstitutional state laws. The County's delegation of electronic monitoring functions to a for-profit company with a financial interest is each of its supervisees violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

66.     Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), Alameda County, its

court, and its probation office are liable for their unconstitutional policies and practices.

## Factual Background

## I.      The Realities of GPS Tracking

### A.      Electronic Shackles Are Debilitating and Intrusive

67.     Under the "Scope of Services" section in the Agreement between Alameda County and LCA, LCA is obligated to "provide an electronic monitoring program" using specified equipment, which it will "install[]" and "remove[]" by attaching GPS tracking devices to the ankles of human beings.  Ex. 1.

68.     LCA attached a BluTag tracking device to Plaintiff William Edwards's ankle that could not be removed.  Ex. 7.  It is 4.33 x 2.08 x 1.25 inches and weighs six ounces, approximately the equivalent having two cell phones bound to one's ankle at all times, including when sleeping, showering, exercising, and during all other activities.

69.     The BluTag tracking device must be charged one hour each day, which means its wearer must sit next to a wall outlet while this process is completed.

70.      If the wearer does not have access to an electrical outlet on a given day or their tracking device otherwise loses its charge, even for a few seconds, the incident will be immediately reported as a non-compliance violation, subjecting the tracked individual to consequences including imprisonment.

71.     Plaintiff James Brooks had two devices attached to his ankle: a GPS tracker and a SCRAM alcohol monitor.  Downloading the alcohol tracking information required him to stand next to the equipment base for ten minutes every night.

72.     Plaintiff Kyser Wilson and Robert Jackson had single devices that tracked both location and exposure to alcohol.

73.      In 2014, Defendant Connelly was quoted in the *SF Weekly* as saying the industry

was debating whether to make tracking devices "small and unobtrusive so there's not a stigma? Or do we make them big and obnoxious, like a Scarlet Letter?" She concluded that the industry had decided on a device that is noticeable but can be covered by a loose pant leg.[2]

74.     LCA must monitor the equipment 24 hours a day and "immediately report all non-compliance events."  Ex. 1, Scope of Services at Exhibit A.

75.     GPS Tracking devices can be programmed to limit a person to a designated area, which can be as small as the inside of an apartment, or to exclude them from certain areas.

76.     The devices can also be programmed so that the shackled person must be at a specific place at a designated time, e.g. at work every day from 9 am to 5 pm, or allow the person to go to an authorized activity, such as a medical appointment on a particular day.

77.     Any deviation from this preset schedule results in a notification to LCA that the shackled individual has violated their terms of release, even if the delay is beyond the person's control — for instance, unanticipated traffic, public transportation not running on time, a delay at a doctor's office, etc.

78.     All deviations from the preset schedule must be approved in advance — therefore a person on the monitor cannot notify LCA that he or she will be late due to unforeseen circumstances and cannot accommodate emergency situations without risking a violation.  There is no way to avoid a violation — and the threat of jail time that comes with it — even if a shackled individual arrives only a few minutes late.

**B.     The Booking Process into LCA's GPS Tracking Program**

79.     Either the Superior Court or the Alameda Sheriff can refer people to LCA as a

---

[2] Rachel Swan, *Jail-To-Go*, SF Weekly May 21, 2014, http://www.sfweekly.com/news/jail-to-go-ankle-bracelets-could-be-the-next-great-law-enforcement-tool-if-the-city-doesnt-get-defeated-by-data/ (last visited June 14, 2018).

form of alternate incarceration or as a form of supervision for those on pre-trial release, parole, or probation.  Once referred, the person must report to one of LCA's offices be booked into the program.

80.     People who are placed on a GPS shackle from LCA are required to fill out an enrollment form, providing basic contact information, employment details, an emergency contact, and information about their court case.  In addition, LCA asks sensitive yet irrelevant questions designed to embarrass individuals in the tracking program, such as whether the person has a "alcohol problem," or the "Last time [they] used illegal or non-prescribed drugs" or "What is/was [their] drug of choice." Ex. 15, Edwards Enrollment Form.

81.     Without conducting an inquiry into ability to pay, LCA requires individuals to sign a "Supervision Fee Agreement" that includes a $150 "Initial Enrollment and Administrative Fee" as well as a commitment to pay $25.50 per day, or $765 per month.  They must pay at least two weeks in advance and pay by credit or debit card, money order, or cashier's check.  *See, e.g.*, Ex. 10, Brooks Enrollment Form; Ex. 15, Edwards Enrollment Form.

82.     By signing the agreement, individuals must agree that "if [they] fail to make a payment by the due date that an incident report will be submitted to the court and/or supervising agency.  Sanctions for failure to make timely payments may include termination from EMP [electronic monitoring program]." *Id.*

83.     If a person is removed from the tracking program for failure to pay, he or she must surrender to the Sheriff and is put in jail.  Even those who are put on electronic monitoring pre-trial, and thus are presumed innocent, can be confined to jail simply because they cannot afford the monitoring fee.

84.     Defendant Linda Connelly stated in an interview that LCA is "stringent" with

Complaint                                    17

policies and procedures.  In fact, courts have complained that LCA files too many notices of violation.[3]

85.     The decision to lock a person up is not based on whether they are a danger to the community or a flight risk, but solely on whether they have enough money to pay LCA to keep them out of jail.

86.     During the monitoring period, individuals on LCA shackles and their families must submit to intrusive and unnecessary supervision.  For instance, those being tracked must agree that LCA representatives may enter their homes at any time of the day or night to verify that they are at home and search for contraband.  *See* Ex. 10, Brooks Enrollment Form; Ex. 15, Edwards Enrollment Form.

87.     This is a particularly egregious violation of the rights of those awaiting trial. Defendant Connelly has admitted that it is inappropriate to have them on a tether because "if they're okay to be out, they should be out without it [a monitor]."  James Kilgore, *Electronic Monitoring Is Not the Answer*, Urbana-Champagne Ind. Media. Ctr. (2015) at p. 11.

88.     Anyone else living in the household with someone being monitored must acknowledge this intrusive measure and also agree to allow unannounced searches of their own homes. Ex. 10, Brooks Enrollment Form; Ex. 15, Edwards Enrollment Form.

89.     The LCA contract mandates that shackled individuals not drink any alcohol, even if their charges are not related to alcohol abuse in any way.  *Id.*

90.     Individuals tracked by LCA must have a phone line that is essentially dedicated to supporting the tracking system.  *Id.*

---

[3] Audio of interview between James Kilgore and Linda Connelly, at minute 15:00.  A copy of the audio is on file with the Plaintiffs' counsel.

91.     Rather than tailoring monitoring conditions to each Class Member, LCA enforces a one-size-fits-all monitoring regime.   LCA imposes irrelevant and costly limitations on monitored individuals designed only to increase its profits rather than enhance community safety.

### C.     Restrictions and Impositions LCA Places on Those Under Its Control

92.     LCA prohibits tracked individuals from using alcohol or drugs, including legally-prescribed marijuana, as a condition of supervision even if their alleged offense was not alcohol or drug-related.   *See, e.g.*, Ex. 4, LCA Client Handbook, Rev 2016 at 5.   LCA imposes this restriction without any basis — neither California law nor the Agreement with Alameda County authorizes LCA to restrict individuals' legal consumption of alcohol or marijuana without a court order.

93.     Based on this arbitrary prohibition, LCA can subject individuals under its control to mandatory drug testing — whether or not their charges are related to illegal use of controlled substances in any way.   Any LCA employee can demand an on-the-spot drug test, and failure to comply will result in LCA seeking "sanctions," including return to jail.   LCA charges individuals a $25 fee for each time it orders such an arbitrary drug test.   Ex. 3, LCA Client Handbook, Rev 2014 at 3; Ex. 4, LCA Client Handbook, Rev 2016 at 5; Ex. 16, LCA Client Handbook, Rev 2017 at 6.   LCA prohibits alcohol and drug consumption in order to create another revenue stream for the company: charging for drug tests.   By creating another unwarranted and unauthorized restriction on those being monitored, LCA creates another trap that can keep Class Members ensnared within the criminal justice system and make more profit for LCA.

94.     Without any legal or contractual justification, LCA also requires individuals on LCA shackles to prove "ongoing employment by submitting paycheck stubs . . . [or] a business license."   LCA benefits from this burdensome mandate, as it is able to monitor individuals'

incomes to increase fees if they acquire a greater ability to pay.  Ex. 3, LCA Client Handbook, Rev 2014 at 3; Ex. 4, LCA Client Handbook, Rev 2016 at 6; Ex. 16, LCA Client Handbook, Rev 2017 at 6.

95.    LCA forbids individuals being tracked from working for cash unless they submit a notarized letter from their employer.  This intrusive financial monitoring discriminates against people with lower incomes, as they are more likely to work intermittently for cash and thus cannot comply with this unreasonable requirement.  Ex. 3, LCA Client Handbook, Rev 2014 at 3; Ex. 4, LCA Client Handbook, Rev 2016 at 6; Ex. 16, LCA Client Handbook, Rev 2017 at 6.

96.    Failure to comply with LCA's demands for financial information is cause for the company to "violate" someone, which could result in their return to jail.

## II.    LCA Extorts Money from Individuals Sentenced to Wear Its GPS Shackles

### A.    LCA's Unlawful Fee Determination Practices

97.    Under the terms of the Scope of Services, LCA is responsible for "case management," including "collection of participant fees."  Although the program is "partcipant funded," LCA is supposed to "adjust participant fees based on ability to pay."  Ex. 1, Exhibit A, Scope of Services.

98.    Under the contract with Alameda County, LCA must "accept and collect payments from defendants on a sliding scale with consideration of each defendant's ability to pay." *Id.*

99.    California law defines "ability to pay" as a person's overall financial situation as shown by his or her "(1) Present financial position. (2) Reasonably discernible future financial position [limited to six months from date of booking]. (3) Likelihood that the person shall be able to obtain employment within the six-month period from the date of acceptance into the program.  (4) Any other factor that may bear upon the person's financial capability to [pay]." *See*

Cal. Penal Code § 1208.2(e)

100.     LCA ignores these four factors and does not adjust fees based on a person's actual financial situation.  Instead, it extorts as much money from individuals wearing its shackles as it can by threatening to return them to jail if they do not pay the amount LCA demands — in violation of Supreme Court precedent, California law, and its contractual obligations.

101.     When an individual is first put into the LCA tracking program, LCA automatically assigns a rate of $25.50 per day and charges a $150 "enrollment fee." Ex. 17, Linda Connelly, *The Argument for Client-funded Programs*, Journal of Offender Monitoring (2015); Ex. 15, Edwards Enrollment Form; Ex. 10, Brooks Enrollment Form.  LCA assigns this fee before obtaining or analyzing an individual's financial information.

102.     When individuals are first put into the high-tech shackle program, LCA automatically charges them for 15 days, or $382.50, plus the $150 "enrollment fee" for a total of $532.50 without any inquiry into whether they can afford that fee or not.  Ex. 3, LCA Client Handbook, Rev 2014 at 2; Ex. 15, Edwards Enrollment Form; Ex. 10, Brooks Enrollment Form.

103.     At no point in the booking process does LCA inform Class Members that their daily fee must be tied to their ability to pay, although it is required to do so under California law.

104.     LCA claims that it has a sliding scale for determining daily payment but that it is "proprietary."  LCA refuses to divulge its method for calculating daily fees based on a person's income, even to the very people upon whom the fees are imposed.

105.     If this sliding scale exists, LCA does not use it to determine a daily monitoring fee that an individual can afford to pay.  Instead, LCA determines financial need under criteria of its own invention that are not court-ordered and are contrary to California law.

106.     LCA claims that a "waiting list may apply" to receive a reduced daily monitoring

fee.  Ex. 2, Edwards Financial Needs Assessment.  California Penal Code § 1208.2 (d)-(e) mandates that fees for participants on electronic monitoring programs be based on ability to pay. This provision does not have a grace period before it applies.  *Id.*

107.   Indeed, LCA states that individuals who apply for a reduced rate after enrollment should "expect a delay in processing."  *Id*.

108.   It is impossible for individuals sentenced to electronic monitoring to apply for reduced payments in advance.  LCA's "waiting lists" and ambiguous "processing" delays are merely another tactic to allow it to charge highest rates possible for at least some period of time, regardless of whether the person can afford it or not.

109.   LCA also falsely claims the ability-to-pay determination is based on "household income," meaning it calculates a single individual's ability to pay based on a combination of the income of every single person living in the home — regardless of their relationship with the monitored individual or their ability and willingness to help pay monitoring fees.  *Id.*  There is no legal basis for this policy.  *See* Cal. Penal Code § 1208.2(e) (defining "ability to pay" as "the overall capacity of *the person* to reimburse the costs, or a portion of the costs, of providing supervision") (emphasis added).

110.   LCA requires household income with the sole purpose of preventing qualifying individuals from receiving the reduced rate to which they are entitled.

111.   LCA's demand that tracked individuals provide financial information from "household members" — whether they are related to the person being monitored or not — is an unauthorized invasion of privacy.

112.   LCA's policy of calculating an individual's ability to pay based on the aggregate income of everyone they live with is especially burdensome on indigent households, where it is

more common for the home composition to be multi-generational, multi-familial, and non-nuclear.

113.    Thus LCA uses it baseless policy to deny reduced rates to shackled individuals based on their grandparents' and parents' social security income; the income of other families renting rooms in the home; the income of their children or romantic partners; or the income of individuals using the address for official purposes but who do not live in or contribute to the household's finances.

114.    LCA arbitrarily decides what can be claimed as an "expense" when determining reduced fees, inexplicably excluding "court costs, including fines, attorney fees, etc."  Ex. 2. Although these costs can easily come to tens of thousands of dollars, LCA excludes them from individual's financial assessment in an effort to force its way to the head of the creditor line.

115.    Thus under LCA's profit-first scheme, an individual on pre-trial monitoring — who faces potentially significant attorney's fees to mount a viable criminal defense — will not have those fees taken into account as they try to ease the burden of paying for their own pre-trial supervision.

116.     Similarly, an individual struggling to pay thousands of dollars in court costs and fines will not have those debts taken into account as they try to successfully reenter society.

117.    LCA has invented two categories — indigent and financially challenged — to further mystify its financial needs assessment.  *Id.*  This distinction has no basis in law and can only serve as an illegitimate ground to deny a fee reduction.

### B.    LCA's Business Model Amounts to Extortion

118.    LCA extorts payments out of shackled individuals by threatening to send anyone who fails to keep up with payments to jail — a consequence severe enough to virtually guarantee payment, even from those who cannot afford it.

119.    Under this pay-or-jail scheme, LCA — by and through the official authority of Alameda County — extracts arbitrary and profit-driven fees from shackled individuals with the threat of incarceration.

120.    California law defines extortion as "the obtaining of property from another, with his consent . . . induced by a wrongful use of force or fear, or under color of official right."  Cal. Penal Code § 518; *see also* 18 U.S.C. § 1961(1) (listing "extortion" as defined by state law as "racketeering activity").

121.    A threat induces sufficient fear to amount to extortion when it promises (1) "an unlawful injury to the person or property of the individual threatened"; (2) accuse[s] the individual threatened . . . , of any crime"; or (3) "expose[s], or to impute[s] to him or them any deformity, disgrace or crime."  Cal. Penal Code § 519.  LCA's business strategy of threatening shackled individuals in its programs with jail unless they pay more than they can afford — even though under the Constitution and California law they may not lose their liberty for inability to pay — constitutes an injury to the person being threatened.

122.    LCA's business strategy of "violating" Class Members on GPS tethers who fall behind on their payments by falsely informing the court that they are violating their terms of release amounts to accusing that individual of a crime.

123.    LCA's business strategy of returning individuals under its control to jail because they fail to pay fees they cannot afford exposes them to the disgrace of being incarcerated.

124.    LCA's business strategy meets the definition of extortion under California law.

125.    Named Plaintiffs William Edwards, Robert Jackson, James Brooks, and Kyser Wilson all paid money to LCA that they could not afford, causing them great hardship, because LCA threatened to "violate" them so that they would be returned to jail if they did not pay what

LCA demanded.  Ex. 5, 6, 9, 18, P. Declarations.

      **C.**      **LCA's Predatory and Misleading Business Practices Violate California Law**

     126.    California law requires LCA to provide "a written statement of the person's rights" related to the monitoring program, including the "fact that the person cannot be denied consideration for or removed from the program because of an inability to pay all or a portion of the program's fees."  Cal. Penal Code § 1208.2(i)(1).

     127.    Named Plaintiffs William Edwards, Robert Johnson, James Brooks, and Kyser Wilson did not receive this required notification when they were booked into LCA.

     128.    LCA failed to inform Named Plaintiffs and fails to inform those similarly situated that they cannot be removed from the program if they cannot afford the daily fee, in violation of California law.

     129.    LCA does not set its daily rate based on ability to pay but rather on how much money it can force each individual to pay the company to maximize its profits.

     130.    LCA also failed to inform Named Plaintiffs and fails to inform those similarly situated that they have a right under California law to a court hearing if there is a disagreement "regarding the person's ability to pay, the amount which is to be paid, or the manner and frequency with which payment is to be made."  Cal. Penal Code § 1208.2(i)(2).

     131.    LCA continues to withhold information from individuals on LCA shackles concerning their right to a hearing to determine their ability to pay.

     132.    LCA deliberately ignores its affirmative obligation to provide information regarding the right to a hearing before the Court regarding "Ability to Pay" determinations.

     133.    Instead, its 2016 Client Handbook states, "*Failure to abide by the fee agreement may result in termination from the program.  LCA will work with a participant if there is a change in their financial status while on the program.*"  Ex. 4, LCA Client Handbook, Rev 2016

at 5.  This statement is misleading and is not adequate to inform individuals of their rights.

134.    Under California Penal Code § 1208.2, LCA has a statutory obligation to charge individuals they are tracking an amount they can afford so that they can remain in the program without financial hardship, starting from the very first day of ordered supervision.

135.    LCA has a statutory obligation to abide by court determinations regarding disputes over ability to pay.

136.    LCA conceals from those forced to pay for their own supervision that they have a right to have payment disputes decided by a judge and is thus blocking access to a third party neutral arbiter who could resolve any dispute against LCA's financial interests.

137.    LCA fails to meet its obligation to avoid imposing financial hardship on those sentenced to wear its monitor, instead resorting to delay tactics, unfair fee calculation practices, and physical threats in order to increase profits gained from individuals under its "supervision."

### D.    LCA's Business Practices Violate Its Contract with Alameda County

138.    Under the terms of its services agreement contract with Alameda County, LCA has a contractual obligation to charge individuals being tracked only what they can reasonably afford.

139.    LCA has breached that duty.

140.     LCA has a contractual obligation to abide by court determinations regarding disputes over ability to pay.  Instead, LCA is concealing the fact that individuals being tracked in its ankle monitor program have a right to have payment disputes decided by a judge and is thus blocking access to a third party neutral arbiter who could resolve any dispute against LCA's financial interests.

141.    In restricting access to the courts, LCA is violating its Services Agreement with Alameda County and Plaintiffs' rights.

E.      **Named Plaintiffs' Interactions with LCA**

142.    Named Plaintiffs do not challenge the validity of their underlying criminal convictions; they instead challenge LCA's abusive practices and LCA's use of the criminal detention power of the government to extort money from indigent individuals sentenced to wear LCA shackles.

i.      **William Edwards**

143.    At the time of the events relevant to this case, Mr. Edwards was an employee of the Contra Costa Public Defender's Office, working for approximately $16 per hour with no benefits.  Ex. 18, Declaration of William Edwards.

144.    Mr. Edwards suffers from Chronic Myeloid Leukemia, a disorder that causes white blood cells to overproduce and reduces the number of red blood cells, leading to oxygen deprivation in the body.  If left untreated, CML will lead to organ failure and death.  *Id.*

145.    To treat this disease, which currently has no known cure, Mr. Edwards must take chemotherapy pills twice a day.  Mr. Edwards frequently experiences pain, nausea, fatigue, and headaches as side effects of the treatment.  In addition, Mr. Edwards must undergo a battery of medical tests and a physical examination at least once a month.  *Id.*

146.    Mr. Edwards's medical condition limits his ability to work due to the side effects of the chemotherapy and his need for frequent medical attention.

147.    In November 2016, Mr. Edwards was driving an acquaintance's car with the owner in the vehicle when the Alameda County police pulled the car over.  The police found drugs in the owner's bag and a firearm in the glove compartment.  The police arrested both men, although nothing linked Mr. Edwards to the drugs or the weapon.

148.    Mr. Edwards spent December 2016 locked up in the Alameda County jail, where his health began to deteriorate as he could not obtain the daily chemotherapy he needed.  In

Complaint                                  27

January 2017, at the point that his life was in danger, Mr. Edwards was released for medical reasons but was required to wear a GPS shackle from January 9 to April 12, 2017, when the charges against him were eventually dropped.  *Id.*; Ex. 19, Edwards Docket.

149.    Mr. Edwards was supposed to be released to LCA so that he could be taken to the hospital for treatment, but LCA failed to pick him up at the jail.  Ex. 20, OR Release to LCA; Ex. 18, Declaration of William Edwards.

150.    On January 6, 2017, Mr. Edwards was released to his attorney who drove him to the hospital.  Under the terms of his release order, Mr. Edwards had to submit to electronic monitoring under the auspices of LCA.  Ex. 21, Jan. 6 Release Order.  In addition, the court authorized Mr. Edwards to work and go to medical appointments at the hospital to treat his cancer.

151.    Mr. Edwards reported to LCA's Oakland office on January 9, 2017, to book himself into the electronic tracking program.  He signed the "participant agreement" on that day.

152.    As part of the LCA booking process, Mr. Edwards provided LCA with information about his income, assets, financial liabilities, and debts.  It also collected information about his medical history.  After collecting this personal information, LCA enrolled him in the program and attached the shackle to his ankle.

153.    LCA staff did not conduct an "ability to pay" assessment as required both by its contract with Alameda County and California law.  In spite of having Mr. Edwards's medical and financial information, Defendant Raelene Rivas, Mr. Edwards's case manager, automatically imposed a fee of $25.50 per day — nearly 20% of his income for an eight-hour working day. Ms. Rivas provided no explanation or justification for that amount.

154.    Ms. Rivas did not inform Mr. Edwards that LCA was obligated to determine his

daily charge on a sliding scale on the basis of his financial situation.

155.    LCA also did not inform Mr. Edwards that he had a right to a hearing before the judge on his case if he disagreed with LCA's assessment of how much he could afford to pay.

156.    In order to begin his sentence in the electronic monitoring program, LCA required Mr. Edwards to pay a total of $532.50; a $150 non-refundable "enrollment fee" and $382.50 for two weeks' advance monitoring.  Ex. 15, Edwards enrollment form.

157.    Although $382.50 represents 15 days' worth of monitoring fees, LCA charges Mr. Edwards $382.50 every two weeks, or 14 days.  LCA never explained or justified this practice to Mr. Edwards.

158.    Mr. Edwards explained to LCA that he was only able to pay $350.  He paid this amount, which was applied to the "enrollment fee" and first week's monitoring, leaving an outstanding balance of $182.50 that Mr. Edwards was unable to pay.  Ms. Rivas told him that someone from LCA would contact him within five days to explain how he could obtain a reduced rate based on his ability to pay.  No one from LCA ever did so.

159.    When Mr. Edwards did not hear back from LCA, he placed multiple calls to Raelene Rivas, LCA's lead case manager, who refused to provide information over the telephone.  Instead, she told Mr. Edwards that if he wanted to be considered for a reduction in fees, he would have to return to LCA's office to pick up the necessary paperwork.

160.    Mr. Edwards asked on several occasions whether he could speak to Ms. Rivas's supervisor to resolve the situation.  On each occasion, Ms. Rivas refused, saying that her supervisor wouldn't want to speak with Mr. Edwards.

161.    When Named Plaintiff William Edwards applied for a reduction in his daily rate, LCA demanded financial information from him and his girlfriend, with whom he shared an

apartment.  LCA then refused to accept the required documents because they were copies, and when Mr. Edwards was not able to produce originals quickly enough, LCA reported to the Alameda County Court that he had violated the terms of his release.  Ex. 22, Incident Report.

162.    In contradiction to California law, Ms. Rivas told Mr. Edwards that LCA is authorized to determine ability to pay based on "household income," including Mr. Edwards's girlfriend, Gina Jenkins.  Ms. Rivas demanded that Mr. Edwards prove that Ms. Jenkins was receiving financial assistance by submitting an original government document.  Ex. 18.

163.    There was no basis for this request in California law or LCA's contract with Alameda County.

164.    The sole purpose for this requirement was to discourage Mr. Edwards from seeking reduced fees so that LCA could extort money from him that he did not have.

165.    Mr. Edwards was forced to take off time from work — and thus lose wages that he needed to provide for his basic necessities — to gather the information that LCA demanded to reassess his daily rate.

166.    In addition, Mr. Edwards was on court-ordered home detention, requiring him to get permission in advance each time he needed to deviate from his set schedule to gather the necessary documents.

167.    LCA created burdensome and unreasonable requirements to delay Mr. Edwards's request for reduced fees — for which LCA staff knew he was eligible — so that they could overcharge him for as long as possible.

168.    Although neither Ms. Rivas or any other staff member contacted Mr. Edwards to explain how to get a reduced daily rate, Ms. Rivas made sure to call Mr. Edwards on January 16, 2017, to demand $182.50 to pay off his outstanding balance from the charges at his booking on

January 9.

169.     On January 23, Ms. Rivas submitted an "incident report" to the Alameda Superior Court, alleging that Mr. Edwards was "non-compliant" because he had "not submitted required verification of household income."

170.     Being out of compliance with the requirements of electronic monitoring is grounds for arrest and return to jail.

171.     Ms. Rivas "violated" Mr. Edwards because he had been unable to comply with her unreasonable demands regarding verification of *household* income, although LCA had no legal basis upon which to consider that information in its assessment of inability to pay.

172.     Mr. Edwards was terrified that LCA would return him to jail, where he feared he would not survive.

173.     Instead Ms. Rivas, acting on behalf of LCA and SuperCom, "violated" Mr. Edwards to intimidate him into paying the daily rate LCA demanded even though he did not have the ability to do so.

174.     By threatening Mr. Edwards's ability to stay out of jail, and thus receive life-saving medical treatment, Ms. Rivas extorted funds from Mr. Edwards.   LCA absorbed Mr. Edwards's payments into its revenue stream, introducing the funds into interstate commerce, thus benefitting itself and its parent company SuperCom.

### ii.     Robert Jackson

175.     Robert Jackson has worked as a forklift operator for approximately seven years. He and his wife Natasha were married in 2011 and created a close-knit family with their daughters, now aged 17, 15, and 9, from previous relationships.  Ex. 9, Declaration of Robert Jackson.

176.     In December 2016, Mr. Jackson pled guilty to a firearms possession charge and

received an eight-month prison sentence with half time credits under PC 4019, or 120 days.  Mr. Jackson began his sentence on January 27, 2017.

177.    Four days later, a guard woke Mr. Jackson at 3:30 am to inform him that his wife had passed away on February 2 from meningitis.

178.    Mr. Jackson immediately contacted his parole officer because his children were now left without a mother or father.

179.    On February 3, Mr. Jackson was released, and his parole officer told him to contact "Belinda" at LCA.

180.    Belinda told him to report to the office immediately although he was trying to arrange his wife's funeral.  She also demanded that he come with $550, money Mr. Jackson did not have.  He was forced to borrow money from his parents, siblings, and friends.

181.    LCA charged Mr. Jackson $250 per week for GPS tracking.  In March, his probation officer requested that SCRAM alcohol monitoring be added, to which Mr. Jackson had no choice but to agree or be returned to jail.

182.    In late February 2017, Mr. Jackson asked if his weekly rate could be lowered because he was facing severe financial hardship — paying approximately 40-50% of his take-home pay to LCA while also trying to meet basic expenses such as rent, food, and necessities for his daughters.

183.    LCA supervisor Jane Doe refused his request based on a short conversation with Mr. Jackson's case manager.  She made no effort to review his documents or consider his request.

184.    Mr. Jackson did not ask again for a reduction in fees because he was afraid that LCA would terminate him from the monitoring program and he would have to return to jail.

185.    Instead, Mr. Jackson made special arrangements at work to get his twice-monthly paycheck on Wednesdays so he could pay LCA by Friday.  Because he could only pay every other week, LCA routinely called him to harass him about being behind on his payments during the "off" weeks when he had no money to spare.

186.     At the end of June, LCA called Mr. Jackson and informed him he owed an additional $800.  LCA did not give him a reason nor offer any accounting or documentation proving the additional debt.

187.    Mr. Jackson had no choice but to agree to their demands because LCA would not remove the tracking devices (and thus stop the accrual of daily fees) unless he paid in full. Fearing a "violation" and return to jail, Mr. Jackson was thus forced to find a way to pay this additional debt to LCA.

188.    In order to raise the money, Mr. Jackson had to sell his car and use the money to rent a storage unit.  He then moved out of his apartment and was forced to place his children with others so that he could get the deposit money back to use to pay LCA.  As a result, his bereaved children lost the stability of their home just a few months after the death of their mother.

189.    Mr. Jackson displaced his family and lost his home to pay LCA the amount they demanded without explanation or justification.

190.    Mr. Jackson had no permanent place to live for the next four months.  It was very difficult for him to see and support his children while moving around between temporary housing.

191.    When Mr. Jackson finally paid LCA the $800, they claimed it was insufficient and he owed them more money.  Again, Mr. Jackson did not receive any accounting or explanation.

192.    Mr. Jackson did not have the extra funds, so LCA refused to notify the court that he had successfully served his sentence until he paid in full.

193.    On June 28, 2017, an LCA employee named Kenya Kyle sent a report to the court stating that Mr. Jackson was in violation of LCA's program because he owed them $122.  Ex. 23, LCA Violation Report, June 28.

194.    The report also noted two times when Mr. Jackson had returned home after his curfew, the first time on May 21 and again on June 4.  Contrary to LCA's contract with Alameda County, which requires immediately reporting non-compliance events, Ms. Kyle had not reported these incidents to the court at the time; only when Mr. Jackson owed LCA money did LCA claim that he was not in compliance.

195.    Mr. Jackson finally managed to make his last payment in August and LCA certified his successful completion of his sentence on August 22, 2017.  Ex. 24, Jackson Final Report.

### iii.    James Brooks

196.    James Brooks is a longshoreman by profession, but he is unable to work because his mother suffered a catastrophic stroke, leaving her paralyzed and in need of 24-hour care.  Mr. Brooks cannot afford to put his mother in a nursing home or hire in-home caregivers full time.

197.    Mr. Brooks is eligible for California's In-Home Supportive Services (IHSS), which provides in-home care to people who are receiving Medi-Cal benefits and are blind, disabled, or more than 65 years old and unable to live at home safely without help.  Mr. Brooks signed up with IHSS to be his mother's care-giver, expecting a salary of $12.50 per hour.

198.    On April 7, 2017, Mr. Brooks was arrested for driving under the influence.  Based on a plea deal reached in November, Mr. Brooks was sentenced to 120 days in jail with half time credits, which the judge ordered be served with a GPS monitor, SCRAM alcohol monitoring

device, and alcohol testing provided by LCA.  Ex. 25, Brooks Sentencing.

199.    Mr. Brooks began his 58-day sentence with LCA on December 17, 2017. LCA required that he wear two separate shackles on one ankle, although LCA has devices that are able to complete both the GPS and the alcohol monitoring functions simultaneously.  Ex. 12, Statistics Power Point.  Mr. Brooks estimates that the devices together weighed two to three pounds and were very awkward to wear.  Ex. 5, Declaration of James Brooks.

200.    Mr. Brooks frequently received calls from LCA saying that he was outside his "allowed area," sometimes as often as twice a week.  Usually this happened when he was washing dishes, as his kitchen sink was out of range of the modem LCA provided.

201.    In order to prove that he was at home, LCA required Mr. Brooks to stop what he was doing and download the information on his monitor, a process that took about 10 minutes. LCA refused to swap out the equipment, instead blaming him for having a bad internet connection.

202.    Due to problems with the IHSS, Mr. Brooks was not paid during the time he was on LCA's tracking program.  In order to pay LCA, he rented out his house and moved in with his mother.  They lived off the leftover rent that he received after paying his mortgage as well as on his mother's social security and disability payments.  When that proved to be insufficient to meet their basic needs, Mr. Brooks scrambled to raise money to satisfy LCA by selling his personal possessions on Craig's List.

203.    Mr. Brooks informed LCA about his desperate financial situation and repeatedly asked for an explanation of how they calculated his daily rate.  His LCA case manager, Jeanette Arguello-Ramos, simply told him "that's how we run things."  *Id.*

204.    Ms. Arguello-Ramos told Mr. Brooks on January 4, 2018 that his daily rate was

$13, amounting to approximately $400 a month.  When Mr. Brooks asked for a breakdown of what he had paid and how the rate was calculated, Ms. Arguello-Ramos said he would have to meet with her supervisor, William Basler.

205.    Mr. Brooks explained to Mr. Basler that it was hard to find caretakers for his mother and when he could, it would cost him $60 for the three-hour minimum plus $15 in transportation to LCA's office.  He again asked to be sent a fee breakdown by email but received no response.

206.    Mr. Brooks then made arrangements to meet with Mr. Basler on the afternoon of January 25, whereupon Mr. Basler emailed him to say that he would be out of the office that afternoon.  *Id.*

207.    LCA staff refused to give Mr. Brooks a daily breakdown of his charges.

208.    In spite of being told he was being charged $13 per day, LCA charged him $1,629 for 58 days, which works out to a daily rate of $28.

209.    At no time did LCA inform Mr. Brooks that he was entitled to apply for a reduced rate, despite LCA being required under the terms of its contract and California law to determine a daily rate based on ability to pay.

210.    LCA also withheld the information that Mr. Brooks was entitled to a hearing before a judge if he and LCA could not agree on a fair daily rate.

211.    Mr. Brooks was forced to pay LCA a total of $1,629 for 58 days of GPS tracking and alcohol monitoring because LCA had convinced him that he would go to jail if he failed to pay and he did not think his mother could survive without him.

### iv.    Kyser Wilson

212.    At the time that Mr. Wilson was under LCA monitoring, he had just started a fulltime job as the night desk clerk at the Hartland Hotel for $14.24 per hour.  Mr. Wilson also

made money on the side as a barber.   He made approximately $2,200 per month.   LCA demanded $650 per month for both GPS tracking and alcohol monitoring, or 30% of his monthly income.

213.   Mr. Wilson was arrested for driving under the influence and driving on a suspended license in June 2016.  Mr. Wilson pleaded guilty and was sentenced to 180 days of LCA monitoring.  On July 25, 2016, LCA booked him into both their alcohol monitoring and GPS tracking programs.

214.   In addition, Mr. Wilson was ordered to pay a fine of $4,509 and complete 56 hours of community service.

215.   Under the terms of LCA monitoring, Mr. Wilson was allowed to go to work, schedule doctor's appointments, and go to church on Sunday.

216.   In addition to his LCA charges, Mr. Wilson had to pay his rent, pay thousands in court-ordered fines, buy basic necessities, and make payments on his car note.

217.   When Mr. Wilson told his case manager that he was having difficulty making his payments, he was told that he could not fall behind or he would be "violated" and remanded into custody.

218.   Mr. Wilson feared that if he did not pay LCA he would be sent to jail and lose his job.

219.   No one at LCA ever told Mr. Wilson that his daily rate was supposed to be based on his ability to pay, that he could apply for a reduced rate, or that he could return to court to request that the judge lower his charges.

## III.   Alameda County's Failure to Supervise Implementation of the LCA Contract

220.    Alameda County and LCA entered into a contract for LCA to provide GPS tracking for individuals in the County's criminal justice system based on referrals from the

Superior Court or probation office.  The contract went into effect on July 13, 2013.  Ex. 1.  It has been renewed every two years since then.

221.    On July 30, 2013, the Alameda County Board of Supervisors authorized a program of home detention and approved the contract with LCA to provide GPS tracking services as part of that program.  Ex. 26, LCA Contract Approval.  By doing so, the Board of Supervisors made it official County policy to delegate GPS tracking of individuals within the County's system to a private for-profit entity.

222.    By delegating the costs of pre- and post-trial supervision, Alameda County saves costs by not running these programs itself.  The County therefore has a direct financial stake in allowing LCA to continue its coercive and unlawful practices.

223.    The California statute authorizing electronic monitoring mandates that no one be excluded from the monitoring program because of inability to pay all or even a portion of the program's fees.

224.    The contract between Alameda County and LCA specifies that LCA must set a daily rate for monitoring that is based on the individual's financial information and ability to pay.

225.    Instead LCA has created a pay-or-jail scheme to maximize profits.  Alameda County has actively allowed that scheme to thrive.

226.    The County has allowed LCA to charge those being tracked more than they can afford, extracting enormous sums.  LCA has also put additional pressure on Class Members by reporting them for violating conditions of their release that were imposed by LCA, not the courts, with the tacit approval and criminal enforcement power of the County.

227.    The joint enterprise between Alameda County, which exercises control over individuals' criminal adjudications and freedom, and LCA, which exercises control over

individuals' "success" within that system based on their ability to pay, violates the due process rights of Plaintiffs and those similarly situated.  Such a scheme does not provide safeguards to protect individuals' liberty interests, but rather is designed to serve Alameda's and LCA's own financial interests.

228.    The joint enterprise between Alameda County and LCA violates the due process rights of Plaintiffs and those similarly situated because LCA's decisions determining who remains out of jail are based on profit motive, not a neutral assessment of whether the person has complied with the conditions of release.

229.    Even though California law requires that no person be terminated from a monitoring program if they cannot afford the monitoring fees, LCA routinely threatens or follows through on such terminations.  The County makes no attempt to monitor or prevent this unlawful practice.

230.    Indeed, LCA routinely deprives individuals of notice, an opportunity to be heard, and access to information and safeguards that would allow them to assert their rights.  The County makes no attempt to monitor or prevent this unlawful practice.

231.    The Alameda County-LCA enterprise violates the equal protection rights of Plaintiffs and those similarly situated because those who can afford to pay LCA do not risk being returned to prison, whereas those who are indigent live with that threat every day because their freedom is contingent upon income.  *See Bearden v. Georgia*, 461 U.S. 660 (1983) (holding that a person cannot be jailed if unable to pay court debt).

232.    Returning someone to jail because they cannot afford to pay a private company hundreds of dollars a month punishes them for being poor and violates their equal protection rights.

233.    LCA's policy is to terminate any Class Member from its tracking program who is more than ten days behind on payments.  This is a particularly harsh practice, as LCA also requires Class Members to maintain at least seven days' worth of daily fees in their account at all times.  Ex. 17, Linda Connelly, *The Argument for Client-funded Programs*, Journal of Offender Monitoring (2015) at 10.

234.    Alameda County's board of supervisors approved the contract with LCA at the request of the head of the County probation office, acting as the County's final policy makers. The County is liable for the injury caused by the contract's unconstitutional implementation.

235.    Alameda County fails to enforce the safeguards in the Alameda County-LCA Agreement, namely reference to the state law requiring that private contractors conduct meaningful ability-to-pay analysis and adjust each Class Member's daily rate as appropriate.  *See* California Penal Code § 1208.2.

236.    By entering into a contract under which LCA's profits would be determined solely by how much money it could get from Class Members, Alameda County acted with objective deliberate indifference to the likelihood the LCA would attempt to extract higher payments than Class Members could afford to pay, in violation of California law and the constitutional rights of individuals sentenced to LCA.

237.    LCA routinely "violates" Class Members for being behind on their payments, giving Alameda County policymakers and officials, including court and probation office employees, actual or constructive knowledge that LCA was and is charging individuals more than they can pay.  Thus the county is liable for LCA's actions.

238.    Alameda County knew that LCA was demanding a daily rate that was not based on an individual's ability to pay and yet did nothing, failing to supervise and thus making it

responsible for violations of California law and tracked individuals' constitutional rights.

239.   Defendant Linda Connolly, LCA's CEO until April 2017, has admitted that LCA violated numerous Class Members subject to GPS tracking.   *See supra* at fn. 3, Kilgore Interview.   By recommending to the Alameda Superior Court and Probation Office that people be removed from LCA's program simply because they could not pay what LCA wanted, LCA violated California law and monitored individuals' constitutional rights.

240.   Alameda County failed to train court and probation office employees to question LCA's pattern of violations for non-payment rather than legitimate probation or supervision violations.   Both California law and the terms of the contract with the County required LCA to tailor its fees to each individual's ability to pay.   Instead, County officials either sent tracked individuals to jail or ignored the violation reports to the court, allowing LCA to continue its illegal practices unchallenged and to injure Plaintiffs with impunity.

241.   County officials are aware of and complicit in LCA's policies and practices.   The Agreement stipulates that LCA's fees must be fair and based on ability to pay and that the Alameda Probation Department "at its sole discretion, may assist LCA with its collection efforts . . . when participants willfully refuse to pay the agreed upon fee."   Ex. 1.

242.   Instead, Alameda County uses its police powers to assist in debt collection efforts that are unfair and not based on ability to pay.

243.   The Agreement also allows LCA to withhold its final certification that an individual has successfully completed the electronic monitoring sentence until it has collected all the fees it has imposed, leaving Class Members pressured into meeting to LCA's demands for money.   The County makes no attempt to stop LCA's illegal withholding of completion reports or profit-driven abuses.

IV.     **Defendants' Conduct Violates the Racketeer Influenced and Corrupt Organizations (RICO) Act**

244.    The Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 ("RICO"), are brought against the LCA Defendants and not Alameda County.

245.    The Plaintiffs are "persons" with standing to sue within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

246.    Defendant LCA is a "RICO person" within the meaning of 18 U.S.C. §1961(3) because it is an entity capable of holding a legal or beneficial interest in property.

247.    Defendant SuperCom is a "RICO person" within the meaning of 18 U.S.C. §1961(3) because it is an entity capable of holding a legal or beneficial interest in property. Defendant SuperCom entered into a contract to buy LCA in January 2013 over a three-year period and completed in the acquisition in January 2016.

248.    Defendants Linda Connelly, Kent Borowick, Diane Harrington, Raelene Rivas, Jeanette Arguello-Ramos, Belinda Doe, and Does 1-10 are each a "RICO person" within the meaning of 18 U.S.C. § 1963(1) because they are capable of holding a legal or beneficial interest in property.

A.     **The RICO Enterprise**

249.    The LCA Defendants, together with Alameda County and the other unnamed conspirators, constitute an association-in-fact, and therefore an enterprise within the meaning of 18 U.S.C. § 1961(4).  This RICO Enterprise is an ongoing contractual and business relationship with the common purpose of unlawfully maximizing the collection of fees by LCA for GPS tracking and alcohol monitoring without consideration of the individual's ability to pay as required by the LCA-Alameda County contract and California law.

250.    The members of the RICO Enterprise function as a continuing unit.   Linda Connelly negotiated and signed the contract with Alameda County that is the basis for the RICO enterprise.   Alameda County courts and probation officers subject Class Members to LCA's electronic monitoring program.   The employees of LCA execute the enterprise by demanding payments that individuals are unable to pay, and then threatening those individuals with jail if they do not produce the money that LCA demands.   LCA and SuperCom collect these overpayments as illegitimate profits.

251.    Alameda County officials fail to adequately supervise the execution of the contract with LCA, allowing the LCA Defendants to maximize profits by extorting fees higher than those allowed by the contract or California law.   Alameda County benefitted by outsourcing a government function at no cost, relieving itself of an administrative burden while LCA took advantage of its contractual relationship with the county to squeeze shackled individuals under its control for payments they could not pay.

252.    The execution of the contract between LCA and Alameda County constitutes cooperation to enable activities that are outside the bounds of a normal commercial operation.

253.    The RICO Enterprise is engaged in interstate commerce because its activities and transactions relating to the collection of money involve activities in California, New York, and Herzliya, Israel.   The activities of the enterprise involve movement and communications across state lines, use of the telephone and internet for monitoring purposes, as well as use of the United States mail service to communicate with Alameda County and Superior Court officials, demand payment from individuals in the monitoring programs, and transmit threats of termination and jailing for nonpayment.

254.    The LCA Defendants have violated 18 U.S.C. § 1962(c) because they are

associated with an enterprise that is engaged in, or the activities of which affect, interstate commerce and have, directly or indirectly, conducted or participated in the conduct of an enterprise's affairs through a pattern of racketeering activity.

255.    The LCA Defendants have violated 18 U.S.C. § 1962(d) because they have conspired with each other to violate 18 U.S.C. § 1962(c).  Specifically, the LCA Defendants conducted or participated in and conspired to conduct the affairs of the RICO Enterprise by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

a.      Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951;

b.      Extortion in violation of Cal. Code § 516PC;

c.      Extortion in violation of the Travel Act, 18 U.S.C. § 1952; and

d.      Wire Fraud, 18 U.S.C. § 1343.

**B.      Predicate Acts**

256.    The LCA Defendants, individually and in conspiracy with the other Defendants, have, on their own and in conspiracy with the other participants in the RICO Enterprise, obtained by threat the various fees discussed in this Complaint, including (but not limited to) the $25.50 daily fee and charges for alleged damage to equipment, with intent to deprive individuals under LCA's control of this money.

257.    The LCA Defendants, individually and in conspiracy with the other participants in the RICO Enterprise, threaten Plaintiffs and similarly-situated individuals on LCA shackles that if they do not agree to pay money to LCA, they: (a) will be terminated from the program; (b) will be accused by LCA of violating the conditions of release; and (c) will be returned to jail without considering Plaintiffs' ability to pay, as required by law.

258.    These threats (a) demonstrate a desire to extort; (b) are premised on deception; (c)

are made in knowing violation of the legal rights of the victims; and (d) are demanded under in violation of LCA's contract with Alameda County and California law.

259.    Because of these unlawful threats, the Plaintiffs paid the fees that LCA demanded out of fear.

260.    The LCA Defendants, on their own and in conspiracy with the other participants of the RICO enterprise, created a fee extortion scheme which intentionally misrepresents or omits participants' legal rights while threatening them with "violation."

261.    Their electronic tracking program is a scheme to defraud participants out of their money.

262.    The LCA Defendants and the other participants of the RICO enterprise used the United States wires and caused the use of the United States wires with specific intent to deceive their victims.

263.    LCA's intent at all times was to maximize profits from participants by deceiving them.  LCA convinced individuals it was authorized to calculate fees based on the household's ability to pay rather than the individual's resources; LCA made clear that individuals had to pay whatever LCA assigned them or go to jail; LCA led individuals to believe they had no choice but to go through LCA's intentionally burdensome process to receive a daily rate that they could afford to pay; and LCA did not inform them of their right to have a judge resolve any dispute about a fair daily rate.

264.     By misinforming or not telling participants their legal rights while threatening them with jail for not paying the demanded amount, the LCA Defendants' fee extortion scheme was reasonably calculated to deceive persons of ordinary prudence.

> **i.      Extortion in Violation of the Hobbs Act, 18 U.S.C. § 1951**

265.    The LCA Defendants have, individually and in conspiracy with the other

participants in the RICO Enterprise, used fear to secure Plaintiffs' consent to pay excessive fees in violation of 18 U.S.C. § 1951 (Hobbs Act).

266.    The proceeds of LCA Defendants' extortionate activities were used in commerce, and therefore affected commerce or the movement of any article or commodity in commerce, as these terms are understood by 18 U.S.C. § 1951(a).

267.    The final buy-out price that SuperCom would pay Defendant Linda Connelly for LCA was dependent on LCA's revenues between 2013-2016.  By collecting higher fees than allowed, LCA inflated its value through fees that were obtained by violating the rights of those being tracked.

### ii.    Extortion in Violation of California Penal Code § 518-19PC

268.    California law defines extortion as obtaining the property of another through wrongful use of fear, with fear defined as being induced by threat of committing an unlawful injury, accusing of that person of a crime, or exposing him or her to disgrace.  *See* Cal. Penal Code §§ 518 and 519.  The LCA Defendants have themselves, and in conspiracy with the other persons in the RICO enterprise, threatened to cause Plaintiffs to be put in jail for violating the terms of their release in order to obtain unlawful amounts of money from Plaintiffs.

269.    Causing someone to be put in jail without legitimate grounds constitutes injury by depriving them of their liberty, and thus constitutes extortion under California law.

270.    Accusing someone of violating the terms of their release is equivalent to accusing them of a crime, and thus constitutes extortion under California law.

271.    Forcing someone back into jail exposes them to disgrace in the eyes of many members of the community, including potential employers, landlords, and law enforcement officers, and thus constitutes extortion under California law.

### iii.    Extortion in Violation of the Travel Act

272.     The LCA Defendants, individually and in conspiracy with the other participants in the RICO Enterprise, have threatened Plaintiffs into paying fees they could not afford with intent to deprive them of money and the enjoyment of their state and federal rights, constituting extortion in violation of 18 U.S.C. § 1952(b)(2) (Travel Act) and California law.

273.     The LCA Defendants have traveled in interstate commerce and have used the mail and facilities in interstate commerce to distribute the proceeds of the extortionate scheme and to communicate with each other and with their victims concerning the operation of the scheme.

274.     LCA is a corporate entity that is wholly owned by SuperCom, a global company based outside of California.  LCA is operating the extortionate activities described herein within Alameda County, California, in violation of 18 U.S.C. § 1952(a)(1).  The LCA Defendants have traveled in interstate commerce, and have used the mail and facilities in interstate commerce to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, or carrying on, of an extortionate scheme, in violation of 18 U.S.C. § 1952(a)(3).

### iv.     Wire Fraud, 18 U.S.C. § 1343

275.     LCA intentionally deceives participants about their legal rights to extort fees and uses United States interstate wires to do so.

276.     LCA's practice of extorting money from participants regardless of ability to pay falls under the definition of wire fraud as it is a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises[.]"  18 U.S. Code § 1343.

277.     In order to track Class Members, LCA "transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."  *Id.*

278.   LCA falsely represents that ability to pay is determined by household rather than individual income; that participants have no recourse when assessed fees they cannot pay, although they have a right to request that a judge review the daily rate; and that they must try to come to an agreement with LCA over their ability to pay before exercising their right under the California Law and the Constitution to have a neutral arbiter assess their ability to pay.

279.   This deception allows LCA to drag participants through a burdensome, lengthy "agreement" process with the intent to make participants keep paying fees they cannot afford as long as possible.

280.   In furtherance of its fee extortion scheme, LCA uses the wires of the United States to make such false representations.  LCA requires participants to have a telephone line open so it can monitor their position and makes participants download and update software provided by SuperCom via the Internet.

281.   The LCA Defendants, individually and in conspiracy with the other participants in the RICO enterprise, have misrepresented participants' legal rights to them through the enrollment process, client handbooks, and fee reduction process so LCA could take the maximum amount of money from participants for as long as possible.

282.   LCA uses telephone wires and SuperCom's proprietary software to track participants' locations in furtherance of this scheme.  LCA forces participants to use the United States wires to update software published by SuperCom in furtherance of this scheme.

283.   The LCA Defendants, individually and in conspiracy with the other participants in the RICO enterprise, have created a scheme to defraud participants and have used and caused the use of interstate and foreign United States wires with the specific intent to defraud participants in violation of 18 U.S.C. § 1343.

C.      **Pattern of Racketeering Activity**

284.    The LCA Defendants and the other participants in the RICO Enterprise have engaged in the racketeering activity described in this Complaint repeatedly since at least 2013 and continue through the present with respect to hundreds of individuals subject to electronic shackling in Alameda County.   LCA Defendants have threatened to "violate" numerous individuals in their electronic monitoring program unless those people paid them money they either did not owe or could not afford.   LCA Defendants have misled numerous participants about their legal rights while being tracked by electronic monitoring.   These racketeering acts are part of the enterprise's regular way of doing business.

285.    The racketeering acts of the LCA Defendants and the other participants in the RICO enterprise have a similar purpose: to maximize the collection of fees by LCA and minimize costs to the County without consideration of the individual's ability to pay and without informing monitored individuals of their legal rights.

286.    The racketeering acts of the LCA Defendants and the other participants in the RICO Enterprise have yielded similar results and caused similar injuries to the Plaintiffs, who have all been subjected to fees paid to Defendant LCA as a result of the LCA Defendants' unlawful conduct.   Moreover, the Plaintiffs have all been subjected to threats of physical confinement for the purpose of financial profit to LCA as well as relinquishing their federal and state rights through onerous and unlawful electronic monitoring conditions.

287.    As set forth in the preceding paragraphs, the racketeering acts have similar participants: LCA Defendants, County officials, and the other participants in the RICO Enterprise.

288.    As set forth in the preceding paragraphs, LCA acted under the color of official capacity as an agent of Alameda County authorized to supervise those ordered by the County

court into LCA's electronic monitoring program.   LCA used that authority to achieve an illegitimate objective, namely threatening to falsely report that shackled individuals were violating the terms of their release in order to receive fee payments to which it was not lawfully entitled.

289.   As set forth in the preceding paragraphs, Plaintiffs reasonably feared that LCA would "violate" them if they did not agree to LCA's demands for payment because LCA had the power to make good on its threats and in fact did report violations to the court based on non-payment, even if the person did not have the ability to pay the amount LCA demanded.

290.   As set forth in the preceding paragraphs, Alameda County did not benefit from LCA's overcharges.  It would have received the same benefit — free monitoring services — had LCA honored the terms of the contract.

291.   As set forth in the preceding paragraphs, LCA Defendants and the other participants in the RICO Enterprise, through the RICO Enterprise, directed their racketeering activities at similar victims: the named Plaintiffs specifically, and, more generally, all individuals on pre-trial release or eligible for alternative sentencing or probation monitoring through the Alameda County court system.

292.   As set forth in the preceding paragraphs, the racketeering acts of the LCA Defendants and the other participants in the RICO Enterprise have similar methods of commission, namely: extorting and deceiving the named Plaintiffs and, more generally, all individuals being monitored electronically under LCA's contract with Alameda County who cannot afford to pay their monitoring fees two weeks in advance, and/or at the daily rate LCA demands, and/or pay for unnecessary and intrusive drug testing.

**D.**   **Proximate Cause**

293.   As a direct and proximate result of the LCA Defendants and the other participants

in the RICO Enterprise's willful, knowing, and intentional acts alleged in this Complaint, the Plaintiffs have suffered injuries to their property. By reason of being forced to pay excessive monitoring fees and surcharges to Defendant LCA, even when they cannot afford to do so without sacrificing the basic necessities of life, Plaintiffs have suffered economic harm to themselves and their families.

294.   It was foreseeable that by demanding fees that Plaintiffs could not afford to pay, Defendants would injure the Plaintiffs.

295.   There are no independent causes of Plaintiffs' injuries: if they had not been ordered to submit to LCA tracking, they would not have been overcharged for electronic monitoring fees.

296.   There is a direct causal connection between LCA demanding fees that the Plaintiffs were unable to pay and their injuries, including a decrease in funds available for everyday necessities, loss of wages due to LCA's unreasonable bureaucratic demands upon individuals attempting to obtain a lower daily fee, separation from family in an attempt to comply with LCA's extortionate demands, and extreme anxiety about being returned to jail for being too poor to comply with LCA's monetary demands.

### E.   Damages

297.   The Plaintiffs are entitled to an award of damages because of LCA's unlawful taking of Plaintiffs' money and forcing Plaintiffs to take on unnecessary loan debt in an amount to be determined at trial, including treble damages and attorneys' fees and costs associated with this action.

## V.   Defendants' Conduct Violates the United States Constitution

### A.   Defendant Alameda County Violates the Due Process Clause

298.   Defendant Alameda County's use of a private actor with an interest in profiting

off of individuals and keeping only those who are able to pay in its electronic tracking program as a supposedly neutral monitoring entity violates plaintiffs' due process rights.

299.    The Due Process Clause of the Fourteenth Amendment prohibits neutral judicial officials and civil and criminal law enforcement actors from having a personal financial interest in the cases they prosecute and manage in our legal system.

300.    Alameda County has contracted with a private, for-profit company to perform a traditional government function — monitoring individuals pre-trial and on probation. The County allows this private entity to dictate decisions about whether Class Members booked into LCA remain under supervision or must return to jail depending on whether they can keep their payments for the monitoring "service" current.

301.    In contrast to the traditional and longstanding role of pretrial services case managers or probation officers, LCA has a direct financial stake in every decision that it makes regarding case supervision, enforcement, and revocation. LCA has a personal financial interest in managing cases to maximize its personal profit and not as a neutral law enforcement officer.

302.    LCA's profits depend significantly on decisions about whether to place people on electronic monitoring, what conditions to require, what information to provide probationers about their rights and obligations, how to enforce those conditions, what reports to make, and what sanctions to recommend. Therefore, there is a clear risk that those financial interests will affect its judgment when it makes those decisions.

303.    Because this private entity has a significant personal financial interest in how these cases are managed — unlike a traditional neutral judicial actor, prosecuting authority, or probation department — the Defendants' policies and practices violate the longstanding due process restrictions against such self-interested financial arrangements in courts of justice.

304.     Under the Defendants' scheme, LCA decides whether to "violate" an individual under its control.  LCA fabricates rules and then uses those restrictions, which have no legal basis, to determine when to drop someone from its program based on the perceived violation of those rules or other conditions.  It also controls how individuals are monitored and what information is provided to or withheld from them concerning their legal rights.

### B.     Defendant Alameda County's Conduct Violates the Equal Protection Clause

305.     Defendant Alameda County's delegation of supervision to a private actor that harasses and threatens individuals who cannot afford illegitimate fees, and threatens those who fall behind on payment with return to jail, violates plaintiffs' equal protection rights.

306.     The Equal Protection Clause of the Fourteenth Amendment prohibits punishing people, including returning them to jail, simply because they are poor.  *Bearden v. Georgia*, 461 U.S. 660 (1983).  Alameda County has contracted with a private, for-profit company to supervise Class Members and then allows LCA to decide who remains free from jail based on ability to pay the fees it demands.

307.     Wealthy individuals who can afford to pay LCA's high daily rates are left in peace and continue their lives, hampered only by the tracking devices themselves.  People living in poverty are subjected to threats, harassment, and bureaucratic stonewalling in order to force them to borrow money or give up basic necessities to avoid going back to jail.

308.     The County's policy of allowing LCA to harass and violate individuals with limited incomes while leaving similarly situated (but wealthy) individuals in peace serves no government interest.  The policy of allowing people to be sent back to jail simply if they cannot pay what LCA demands constitutes punishing people because they are poor.

309.     By wielding the police power delegated by Alameda County, LCA can, and does, send people to jail simply because they cannot pay the amounts that it demands.  Defendants'

Complaint                                           53

policies and practices violate the longstanding equal protection restrictions against punishing people simply for being unable to pay.

### C.  Defendants' Conduct Is an Abuse of Process

310.  LCA abuses the legal process to seek arrest warrants and revocation of electronic monitoring orders with an ulterior motive to collect additional fees.

311.  LCA files written documents with the Alameda County court that can trigger the revocation process.

312.  When individuals on electronic shackles are unable to pay what LCA demands, LCA "violates" the indigent non-payer by reporting them to the Alameda County court, which then has the option to revoke the person's release.

313.  LCA engages in this activity, which is completely unrelated to public safety, with the ulterior motive of either pressuring people to pay or returning people to jail to scare other indigent individuals under its control into coming up with the demanded funds.

314.  LCA also engages in an abuse of process by using monitoring not to do justice and assist individuals, but for the ulterior motive of making profit by setting fees, performing drug tests, and using the threat of removal from the program to extort money.

### D.  Alameda County Is Liable for Its Unconstitutional Policies and Practices and Its Failure to Train

315.  A government body such as Alameda County may be held liable under 42 U.S.C. § 1983 when the execution of government policy or custom, that may be fairly said to represent its official policy, inflicts injury on a plaintiff.

316.  Alameda County established an official policy of contracting out electronic monitoring of individuals in the County's court system to a private entity, LCA. Alameda County's Board of Supervisors ratified a contract with LCA to memorialize this policy.

317.    This policy deprived Class Members, including the Plaintiffs, of their right under the Fourteenth Amendment to have a neutral arbiter to make decisions about their freedom while involved with the criminal justice system.

318.    Alameda County both created, ratified, and implemented this policy.  Therefore, it is liable for the constitutional violations committed LCA employees because it allows LCA to send those to jail who do not have the resources to buy their freedom.

319.    Through its contract with Alameda County, LCA and its employees are performing essential government functions.

320.    The conduct of LCA Defendants and LCA employees is attributable to Alameda County.

321.    In allowing LCA to ignore its obligation to determine how much each Class Member on its electronic monitoring program could pay, Alameda County violated Plaintiffs' clearly established rights under the Fourteenth Amendment to the United States Constitution. Plaintiffs have a right to have neutral arbiters decide their cases and not to be jailed simply because they are poor.

322.    At all times relevant to this Complaint, LCA was acting under color of the laws of the State of California and Alameda County.

323.    At the time LCA was demanding fees from individuals under its control that they could not afford, California Penal Code § 1208.2 provided (and still provides) that any individual who is eligible for electronic monitoring instead of incarceration may not be denied that option because of inability to pay.  Nevertheless, the LCA Defendants demanded payment from individuals that LCA employees knew they could not afford.

324.    Alameda County has a contractual and legal obligation to monitor the execution

of the contract with LCA to ensure that electronic monitoring is being provided in accordance with the terms of the contract and California law.

325.    The County is also liable for failure to train employees, leading to the deprivation of constitutional rights.  Alameda County fails to train its court personnel, administrators, and employees adequately with respect to the procedural and substantive rights of Class Members not to be imprisoned simply because they are poor, and the rights of Class Members who cannot pay a private company what it demands to maintain their freedom.

326.    County managers and employees who were responsible for monitoring LCA's performance displayed deliberate indifference to the constitutional rights of those subject to LCA's electronic monitoring program.  The County failed to supervise and discipline its administrators and employees for not protecting the rights of Class Members on electronic monitoring under the Constitution and California law.

## VI.    Class Action Allegations

327.    The named Plaintiffs bring this action, on behalf of themselves and all others similarly situated, to assert the claims alleged in this Complaint on a common basis.

328.    A class action is a superior means, and the only practicable means, by which the named Plaintiffs and unknown Class Members can challenge Defendants' unlawful "pay-or-jail" extortion scheme.

329.    This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(l)–(4) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

330.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

331.    Plaintiffs propose one Class seeking declaratory and injunctive relief as well as damages.  The Class is defined as: <u>All individuals who have been or will be put on any LCA</u>

monitoring program by the Alameda County Court system from 2013 until this litigation is complete.

A.    **Numerosity — Fed. R. Civ. P. 23(a)(1)**

332.    Between January 2015 and September 2016, LCA monitored an average of 112 people a day for the Alameda County Court system, for a total of 746 individuals.  Ex. 12, Statistics Power Point.

333.    On May 17, 2018, in one courtroom (Department 112), 18 percent of the docket was comprised of individuals involved with LCA (three out of seventeen).  Of the two individuals sentenced that day, both were assigned to LCA.

334.    In FY 2016-17, Alameda County disposed of 246,058 criminal cases.  If only 1 percent of those cases resulted in electronic tracking, that would account for over 2,400 people.[4]

335.    A review of SuperCom's publicly available financial documents does not indicate that LCA has suffered any drop in business since September 2016.  In fact, SuperCom's investor presentation from May 2018 calls electronic monitoring an "[i]ncreasing source of high-margin, recurring revenues."[5]

336.    SuperCom reported 11.3 million dollars in revenue in 2017 from electronic tracking alone.

337.    Hundreds of people currently involved in the Alameda County court or probation system are subject to electronic or alcohol monitoring by LCA and are being charged rates that they cannot afford.

---

[4]   Judicial Council of California, 2017 Court Statistics Report, Appx. G (2017), http://www.courts.ca.gov/documents/2017-Court-Statistics-Report.pdf (last visited June 15, 2018).
[5]   http://docs.wixstatic.com/ugd/78f816_c30c3182be9e4d9085773b543d2ce718.pdf, at 15 (last visited June 15, 2018).

**B.      Commonality — Fed. R. Civ. P. 23(a)(2)**

338.    The relief sought is common to all Class Members, and common questions of law and fact exist as to all Class Members.  The named Plaintiffs seek relief concerning whether LCA's fee extortion scheme violates the rights of the Class Members under the Constitution and California law.  They further seek relief mandating that Defendants end the "pay-or-jail" scheme and, as appropriate, pay damages so that the rights of the Class Members and future LCA clients are vindicated.

339.    These common legal and factual questions arise from one scheme: LCA's policy of demanding fees from individuals under the its control, regardless of their ability to pay those fees, and threatening to return individuals to jail if they do not meet LCA's demands.  The material effects of the unlawful implementation of the electronic monitoring contract do not vary from Class Member to Class Member, and the resolution of these legal and factual issues will determine whether all Class Members are entitled to the relief they seek.

340.    Among the most important, but not the only, common questions of fact are:

- Whether Alameda County has a policy and practice of failing to follow California law and the United States Constitution by allowing LCA to extort fees from electronic monitoring individuals that they cannot afford under the threat of returning them to jail;
- Whether Alameda County, acting by and through LCA, has failed to supervise LCA and/or train its employees to conduct the ability to pay analysis for each individual under LCA control, referred by Alameda County, as required by California law;
- Whether Alameda County, acting by and through LCA, has failed to supervise LCA and/or train its employees to prevent the unlawful extortion of fees under its electronic monitoring program;
- Whether the LCA Defendants committed the predicate acts of extortion by threatening to "violate" Alameda County Defendants if they fell behind on payments, even if they had evidence that the individual did not have the money to pay;
- Whether LCA Defendants had a policy of "violating" individuals being tracked for failure to pay even small amounts in order to scare others into paying in full;
- Whether the LCA Defendants as a matter of policy did not tell individuals being

tracked that they only needed to pay what they could afford; created bureaucratic hurdles to applying for financial assistance; and withheld information about appealing disputes over a fair fee to the presiding judge; and

- Whether LCA Defendants in fact have a sliding scale of fees tied to income, or whether the company has a policy of automatically charging Class Members $25.50 a day for as long as possible.

341.   Among the most important, but not the only, common questions of law are:

- Whether fundamental principles of due process forbid Alameda County from turning over its electronic monitoring program to LCA, a non-neutral arbiter that has a business interest in extracting as much money as possible from individuals under its control and sending those who fail to meet its financial demands back to jail as a warning to others;
- Whether Alameda County's failure to monitor the execution of the contract with LCA, thus subjecting them to fee-driven consequences for criminal behavior, constitutes a violation of Class Members' civil rights;
- Whether Alameda County's failure to ensure LCA was conducting the ability to pay analysis required by California law before causing people to be remanded into custody constitutes a procedural due process violation;
- Whether Alameda County had a policy and practice of allowing LCA to extort money from electronic monitoring Class Members, subjecting it to liability under *Monell v. Department of Social Services*;
- Whether Alameda County failed to train its employees to monitor the Agreement with LCA to prevent abuses, subjecting it to liability under *Monell v. Department of Social Services*;
- Whether LCA's demands that indigent individuals pay a daily rate for GPS tracking and alcohol monitoring beyond what they can afford violates California law;
- Whether LCA's failure to conduct meaningful ability to pay analyses violates California law;
- Whether the contract between Alameda County and LCA constitutes an enterprise under RICO; and
- Whether forcing indigent Class Members to pay daily rates beyond what they can afford by threatening to return them to jail constitutes extortion under RICO.

### C.    Typicality — Fed. R. Civ. P. 23(a)(3)

342.   The named Plaintiffs' claims are typical of the other Class Members' claims, and they have the same interests in this case as all other Class Members.  Each Class Member has had or will have fees set by LCA for electronic tracking that they are unable to pay.  The answer to whether Defendants' fee schedule and collection procedures are unlawful will determine the

claims of the named Plaintiffs and every other Class Member.

343.   If the named Plaintiffs succeed in the claim that Defendants' policies and practices concerning fee collection violate their constitutional rights, constitute a RICO conspiracy, or violate California law, that ruling will likewise benefit every other Class Member.

**D.     Adequacy — Fed. R. Civ. P. 23(a)(4)**

344.   The named Plaintiffs are adequate representatives of the Class because their interests in the vindication of the legal claims that they raise are entirely aligned with the interests of the other Class Members, who each have the same constitutional and legal claims. They have been subjected to GPS and/or alcohol monitoring both pre-trial and as part of a sentence, thus representing the various ways LCA's monitoring programs are used in Alameda County.  Named Plaintiffs are members of the Class, and their interests coincide with, and are not antagonistic to, those of the other Class Members.

345.   There are no known conflicts of interest among Class Members, all of whom have a similar interest in vindicating their constitutional and legal rights in the face of Defendants' fee extortion scheme.

346.   Plaintiffs are represented by attorneys from Equal Justice Under Law and the Law Offices of Kevin E. Mitchell, all of whom have experience in litigating complex civil rights matters and criminal matters in federal and state court and extensive knowledge of both the details of Defendants' scheme and the relevant constitutional and statutory law.

347.   The combined efforts of Class counsel have so far included extensive investigation into Defendants' contract and LCA's execution of its extortion scheme, including interviewing attorneys in the Bay Area, as well as state and national experts in electronic monitoring.

348.   Class counsel have a detailed understanding of local law and practices as they

relate to federal constitutional requirements.

349.   As a result, counsel have devoted enormous time and resources to becoming intimately familiar with Defendants' scheme and with the relevant state and federal laws.  The interests of the Class Members will be fairly and adequately protected by the named Plaintiffs and their attorneys.

**E.   Rule 23(b)(2)**

350.   Class action status is appropriate because Defendants have acted or will act in the same unlawful and unconstitutional manner with respect to all Class Members.  LCA Defendants enforce a punitive and counterproductive fee extortion scheme by demanding that individuals subject to electronic monitoring shackles pay a daily fee without consideration of their financial circumstances or ability to pay.  Alameda County has a policy and practice of ignoring LCA's activities, allowing its contract to act as a cover for illegal activity.

351.   The Class therefore seeks declaratory and injunctive relief to enjoin Defendants from demanding daily fees that individuals under LCA's control cannot afford to pay.  Because the putative Class challenges Defendants' "pay-or-jail" scheme as unconstitutional and unlawful through declaratory and injunctive relief that would apply the same relief to every Class Member, Rule 23(b)(2) certification is appropriate and necessary.

352.   Injunctive relief compelling Defendants to comply with these constitutional rights will similarly protect each Class Member from being subjected to Defendants' unlawful policies and practices.  A declaration and injunction stating that Defendants must guarantee that anyone eligible can participate in the electronic monitoring program at a rate he or she can afford — including at no cost at all — would provide relief to every Class Member.  Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

353.   A damage award against the Defendants for violating these constitutional rights

will similarly compensate each Class Member for being subjected to Defendants' unlawful policies and practices.  A damage award returning to Plaintiffs the money that they were forced to pay — or more — would provide relief to every Class Member.  Therefore, a damage award with respect to the Class as a whole is appropriate.

## CLAIMS FOR RELIEF

### Count I: Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. § 1962 (c) and (d)
### (Against Defendants LCA, SuperCom, Connelly,
### Borowick, Harrington, Arguello-Ramos, Rivas, and Does 1–10 )

354.   Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

355.   LCA, its parent company, founder, and some of its employees, have conspired to create an enterprise that operates in interstate commerce to extort money by charging those under LCA's supervision daily rates far beyond their ability to pay.  Defendants have engaged in the predicate acts of extortion and wire fraud to induce fear in those under their control for the purpose of obtaining as much money as possible; Defendants routinely threaten individuals on the LCA shackle who fall behind on their payments with court-notified "violations," effectively threatening individuals with jail if they do not pay the exorbitant fees demanded by LCA.  These acts constitute a pattern of racketeering activity that has caused the Plaintiffs damage, including financial harm, disruption of family ties, deterioration of health, and mental stress.

### Count II: Due Process Violation Under the
### Fourteenth Amendment and 42 U.S.C. § 1983
### (County Defendants and LCA Defendants)

356.   Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

357.   County Defendants use a private actor (LCA) with a strong profit motive to track

people on pre-trial supervision and home detention.  LCA Defendants erect unnecessary barriers and use deceptive and illegal practices to ensure supervisees lack (a) access to fee adjustments to which they are lawfully entitled, (b) ability-to-pay-inquiries, (c) adequate notice of fee calculation, and (d) neutral judicial review of fee demands.  Defendants thereby violate Plaintiffs' due process rights — including adequate notice, opportunity, and the right to have a neutral judicial officer make decisions bearing on their fundamental liberty rights — within the criminal justice system.

358.   County Defendants — through the contract with LCA, through a policy and practice of allowing LCA Defendants to violate Class Members' constitutional rights, and through failing to train its court and probation officers to monitor LCA's practices and identify abuses — also violate Plaintiffs' rights under the Equal Protection Clause

### Count III: Violation of Equal Protection Under the
### Fourteenth Amendment and 42 U.S.C. § 1983
### (County Defendants and LCA Defendants)

359.   Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

360.   LCA Defendants use constant threats of jail and extortion against those who cannot afford the daily fees and who fall behind on payment, violating Plaintiffs' right under the Equal Protection Clause not to be imprisoned or punished simply because of their wealth status.

361.   County Defendants — through the contract with LCA, through a policy and practice of allowing LCA Defendants to violate Class Members' constitutional rights, and through failing to train its court and probation officers to monitor LCA's practices and identify abuses — also violate Plaintiffs' rights under the Equal Protection Clause.

### Count IV: Abuse of Process
### (LCA Defendants)

362.    Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

363.    LCA Defendants engage in abuse of process by using the Alameda County court system to extort fees from people sentenced to LCA who do not have the financial resources to meet LCA's demands for payment.

### Requests for Relief

WHEREFORE, the Plaintiffs demand a jury trial and the following relief:

a.      A declaratory judgment that subjecting the Plaintiffs to the Defendants' conduct as alleged in the Counts listed above is unlawful;

b.      An order and judgment preliminarily and permanently enjoining the Defendants from continuing the above-described unconstitutional and illegal policies and practices against the Plaintiffs and the Class of similarly situated people on whose behalf they are bringing suit;

c.      A judgment compensating the Plaintiffs and the Class of similarly situated individuals for the damages that they suffered as a result of the Defendants' unconstitutional and unlawful conduct;

d.      A judgment granting the treble and punitive damages authorized by statute based on the Defendants' willful and egregious violations of the law;

e.      An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 18 U.S.C. § 1964, and any other relief this Court deems just and proper.

Respectfully submitted,

*/s/ Phil Telfeyan*
Phil Telfeyan
Catherine Sevcenko (*pro hac vice* pending)
Marissa Hatton (*pro hac vice* pending)
Equal Justice Under Law
400 7th Street NW, Suite 602
Washington, D.C. 20004
(202) 670-1004
ptelfeyan@equaljusticeunderlaw.org
catherine@equaljusticeunderlaw.org
mhatton@equaljusticeunderlaw.org