IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WILLIAM EDWARDS, ROBERT JACKSON, JAMES BROOKS, and KYSER WILSON, individually and on behalf of others similarly situated,

Plaintiffs,

v.

LEADERS IN COMMUNITY ALTERNATIVES, INC., SUPERCOM, INC., LINDA CONNELLY, DIANE HARRINGTON, KENT BOROWICK, RAELENE RIVAS, JEANETTE ARGUELLO-RAMOS, BELINDA DOE, DOES 1–10, inclusive, ALAMEDA COUNTY, and WENDY STILL,

Defendants.

No. C 18-04609 WHA

**ORDER RE MOTIONS TO DISMISS**

**INTRODUCTION**

In this putative class action for alleged fraudulent and extortionate conduct, defendants move to dismiss. For the reasons below, the Alameda defendants' motion to dismiss is **GRANTED**. The LCA defendants' motion to dismiss is **GRANTED IN PART AND DENIED IN PART**.

**STATEMENT**

Defendant County of Alameda contracted with defendant Leaders in Community Alternatives, Inc. to provide an electronic-monitoring program, including GPS and alcohol monitoring, for criminal defendants on pre-trial or home detention. Defendant SuperCom, Inc.

was LCA's parent company. LCA executives and employees included defendants Diane Harrington (executive director), Linda Connelly (founder, president and CEO), Kent Borowick (CFO and COO), Raelene Rivas (case manager) and Jeanette Arguello-Ramos (case manager) (Compl. ¶¶ 1, 47–56).

Under the contract between Alameda County and LCA, both the superior court and the probation department referred individuals to LCA's program. Once referred, LCA tracked the participants, providing the necessary equipment, and reported any non-compliance. Defendant Wendy Still, Alameda County's chief probation officer, oversaw Alameda County's contract with LCA. On average, 112 Alameda County residents participated in LCA's electronic monitoring on any given day (*id*. ¶¶ 4, 47, 62, 64, 67, 79).

Plaintiffs William Edwards, Robert Jackson, James Brooks, and Kyser Wilson were referred to LCA's program. LCA required plaintiffs to fill out an enrollment form which included, among other things, basic contact information, employment details, and information about their court case. Without conducting an inquiry into their ability to pay, LCA required plaintiffs to sign a "Supervision Fee Agreement" that imposed a $150 enrollment fee and a commitment to pay $25.50 per day. Plaintiffs had to pay at least two weeks in advance by credit or debit card, money order, or cashier's check. Plaintiffs also agreed that failure to make timely payments could result in their termination from electronic monitoring (*id*. ¶¶ 80–82).

LCA's program was (and still is) fully funded by fees charged to participants. Neither Alameda County nor its probation department had any financial responsibility for the program. Although LCA's contract provided that LCA must "adjust participant fees based on ability to pay," and although Section 1208.2(g) of the California Penal Code provided that persons cannot be removed from an electronic-monitoring program "because of an inability to pay all or a portion of the program supervision fees," LCA did not inform plaintiffs that they only needed to pay what they could afford. Nor did LCA inform plaintiffs of their right to have a judge determine how much they can afford to pay while on LCA's monitoring programs (*id*. ¶¶ 5, 12–14, 97–99).

LCA also imposed a series of "roadblocks" to keep individuals from obtaining a reduced fee. For example, LCA claimed that the ability-to-pay determination was based on "household income," meaning the combined income of every person living in the home regardless of their relationship with plaintiff or their ability and willingness to help pay LCA's fees. LCA also excluded "court costs, including fines, [and] attorney fees" as expenses in plaintiffs' financial assessments. Plaintiffs all paid LCA amounts they could not afford because they feared LCA would "violate" them so that they would return to jail if they failed to pay (*id*. ¶¶ 105–14, 125).

Based on these allegations, plaintiffs filed this putative class action in July 2018, asserting a RICO claim, claims under Section 1983 of Title 42 of the United States Code, and a claim for abuse of process. Defendants now move to dismiss the complaint in its entirety (Dkt. Nos. 1, 22–23). This order follows full briefing and oral argument.

## ANALYSIS

### 1. NO STANDING FOR INJUNCTIVE RELIEF.

In addition to monetary damages, plaintiffs seek an order enjoining defendants' "illegal fee extortion scheme." The constitutional standing requirement derives from Article III, Section 2 of the United States Constitution, which restricts adjudication in federal courts to "cases" and "controversies." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). Article III standing is present only when (1) a plaintiff suffers a concrete, particularized injury which is actual or imminent; (2) there is a causal connection between the injury and the conduct complained of; and (3) the injury will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

Where, as here, a plaintiff seeks prospective injunctive relief, standing requires a "real and immediate threat" of future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). Although all plaintiffs participated in LCA's electronic-monitoring program in the past, no plaintiff currently participates in the program. The complaint instead alleges that plaintiffs Jackson, Brooks, and Wilson are on probation and are "reasonably likely to be sentenced to LCA should [they] be found in violation of the terms of [their] probation." This scenario is too speculative to satisfy the standing requirements for injunctive relief. Courts assume that

3

1  plaintiffs "will conduct their activities within the law and so avoid prosecution and conviction."
2  *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974).  Plaintiffs' musings that they will violate the
3  terms of their probation and that such violations will result in a sentence of electronic monitoring
4  are insufficient.

Plaintiffs' additional allegations that (1) Jackson may be sentenced to electronic monitoring in connection with a DUI case if he cannot afford the Sheriff's Work Alternative Program, (2) Brooks is still making payments on his bond and Wilson cannot pay his restitution because they paid LCA's fees at rates they could not afford, and (3) Wilson does not have a valid driver's license and may be stopped, prosecuted, and sentenced to electronic monitoring if he has to drive in an emergency, are also too speculative.  Plaintiffs fail to allege, for example, that they have ever violated the terms of their probation, that Jackson cannot, in fact, afford SWAP, or that Brooks or Wilson have failed to make a court-ordered payment.  Moreover, even if plaintiffs had alleged a reasonable likelihood of a technical violation of the terms of their probation (such as a missed court date or meeting with their probation officer) the complaint lacks any factual allegations to support their claim that such minor violations would result in electronic monitoring.  As currently pled, the complaint fails to allege facts showing a "real and immediate threat" of future injury.  *Lyons*, 461 U.S. at 105.

Finally, although not alleged the complaint, the parties explain that Edwards is currently incarcerated on a no-bail hold pending new murder charges.  Plaintiffs argue that because Edwards is currently incarcerated and in pre-trial proceedings, he could be released pre-trial or sentenced to electronic monitoring because he suffers from chronic myeloid leukemia.  In light of Edwards' medical condition, plaintiffs argue, it is "more than mere conjecture" that he could be released from jail and placed on electronic monitoring.  As an initial matter, in deciding a motion to dismiss, a court is ordinarily limited to the face of the complaint.  *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).  But even if alleged in the complaint, Edwards' first-degree murder charges are pending in Contra Costa County, not Alameda County.  Plaintiffs have accordingly failed to show a reasonable likelihood that Edwards would be referred to LCA's electronic-monitoring program.

4

To the extent plaintiffs argue that they may seek injunctive relief on behalf of the putative class even if they themselves lack standing, they are incorrect. Plaintiffs cite *Gerstein v. Pugh*, 420 U.S. 103 (1975), which involved detainees raising claims concerning their pre-trial detention. Although normally a class action is moot if no named class representative with an unexpired claim remains at the time of class certification, *Sosna v. Iowa*, 419 U.S. 393, 402, n.11 (1975), the Supreme Court in *Gerstein* held that the case remained live because pre-trial custody was inherently temporary and the court could not determine "that any given individual, named as plaintiff, would be in pretrial custody long enough for a district judge to certify the class." *Id.* at 110 n.11. Here, by contrast, an individual may be referred to electronic monitoring either in connection with pre-trial release *or* in connection with sentencing for a criminal conviction. Plaintiffs' conclusory allegation that "[o]nly individuals with relatively short sentences may be booked into LCA's program, resulting in supervision durations that are capable of repetition but evading review," Compl. ¶ 36, is insufficient to invoke *Gerstein*'s exception. Defendants' motions to dismiss plaintiffs' claims for injunctive relief are accordingly **GRANTED**. This order need not reach defendants' alternative argument that plaintiffs' claims for injunctive relief are moot in light of recent changes to LCA's policies.

**2.    NO *YOUNGER* ABSTENTION.**

*Younger v. Harris*, 401 U.S. 37 (1971), requires federal courts to abstain from exercising jurisdiction where "(1) a state-initiated proceeding is ongoing; (2) the proceeding implicates important state interests; (3) the federal plaintiff is not barred from litigating federal constitutional issues in the state proceeding; and (4) the federal court action would enjoin the proceeding or have the practical effect of doing so, i.e., would interfere with the state proceeding in a way that *Younger* disapproves." *San Jose Silicon Valley Chamber of Commerce Political Action Comm. v. City of San Jose*, 546 F.3d 1087, 1091–92 (9th Cir. 2008) (citations omitted). All four elements of *Younger* must be present in order for abstention to be appropriate.

Here, the first factor of *Younger* abstention does not apply. Defendants argue that by seeking relief related to the conditions of their probation, plaintiffs' claims involve "state court

5

criminal sentencing and probation proceedings." In a decision not cited by either side, our court of appeals explained:

> Probation is not a pending criminal action for *Younger* purposes . . . The Supreme Court has made clear that federal post-trial intervention is not precluded by *Younger*, unless the intervention is designed to annul the results of a state trial by expunging an individual's record or by removing other collateral effects of his conviction.

*Almodovar v. Reiner*, 832 F.2d 1138, 1141–42 (9th Cir. 1987) (internal citations omitted). Plaintiffs do not seek to have their records expunged or to otherwise overturn an aspect of a state-court order. Rather, they seek damages in the form of amounts paid to LCA. Because plaintiffs' probationary status does not amount to ongoing state judicial proceedings for *Younger* purposes, abstention is not warranted here.

Pointing to Section 1208.2(h) of the California Penal Code, plaintiffs next argue that *Younger* abstention applies because plaintiffs' claims regarding amounts paid under LCA's program "should be decided by the state criminal courts." Section 1208.2(h) provides:

> If the person and the administrator, or his or her designee, are unable to come to an agreement regarding the person's ability to pay, or the amount that is to be paid, or the method and frequency with which payment is to be made, the administrator, or his or her designee, shall advise the appropriate court of the fact that the person and administrator, or his or her designee, have not been able to reach agreement and the court shall then resolve the disagreement by determining the person's ability to pay, the amount that is to be paid, and the method and frequency with which payment is to be made.

Defendants do not contend, however, that plaintiffs or defendants ever initiated such proceedings. Defendants' motion to dismiss on this ground is **DENIED**.

**3. CONSTITUTIONAL CLAIMS.**

**A. Alameda County.**

*(1) Equal Protection.*

The Equal Protection Clause of the Fourteenth Amendment prohibits the government from denying individuals equal protection of the laws. U.S. CONST. amend. XIV, § 1. "While Equal Protection is typically used to analyze government actions that draw a distinction among people based on specific characteristics, it is also used if the government discriminates among people as to the exercise of a fundamental right." *Buffin v. City & Cty. of San Francisco*, No.

6

15-cv-04959, 2018 WL 424362, at *7 (N.D. Cal. Jan. 16, 2018) (Judge Yvonne Gonzalez Rogers).

Plaintiffs allege that defendants' "pay-or-jail scheme" violates the Equal Protection Clause because indigent defendants are threatened with probation violations and associated criminal consequences while those who can afford to pay LCA's high fees are not. A rational-basis review applies to plaintiffs' equal-protection claim. Citing *Bearden v. Georgia*, 461 U.S. 660 (1983), and other cases in our Supreme Court's criminal-law jurisprudence, plaintiffs argue that criminal consequences based on indigence, including probation revocation, are impermissible under the Fourteenth Amendment and therefore warrant greater scrutiny than rational-basis review. Here, however, plaintiffs do not allege that they were incarcerated or had their probation revoked due to their failure to pay LCA's fees. Rather, plaintiffs bring a civil lawsuit for monetary damages based on allegations the LCA extorted them for (and defrauded them out of) fees they could not afford. Rational-basis review applies to plaintiffs' equal-protection claim.

Under a rational-basis review, defendants' purported "wealth-based" classification "must be sustained unless 'the classification rests on grounds wholly irrelevant to the achievement of [any legitimate governmental] objective.'" *Harris v. McRae*, 448 U.S. 297, 322 (1980) (alteration in original) (citation omitted). Alameda County's interest in providing an electronic-monitoring program as an alternative to incarceration is legitimate and requiring individuals to pay fees to participate in the program is rationally related to that interest. Moreover, as far as the complaint alleges, the conduct underlying defendants' "scheme" — *i.e.*, convincing plaintiffs that LCA could calculate fees based on the household's ability to pay, threatening plaintiffs that they had to pay LCA's assigned fees or be terminated from the program, leading them to believe they had to go through LCA's burdensome process to receive a reduced rate, and failing to inform plaintiffs of their rights under the Penal Code — was uniformly applied regardless of financial status. Because the complaint fails to allege facts plausibly suggesting that Alameda County violated the Equal Protection Clause, Alameda County's motion to dismiss this claim is **GRANTED**.

7

*(2)* *Due Process.*

The Due Process Clause of the Fourteenth Amendment prohibits the government from depriving individuals of their life, liberty, or property, without due process of law. U.S. CONST. amend. XIV, § 1. In general, it "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Accordingly, the threshold inquiry in every due process challenge is "whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (quoting Fourteenth Amendment).

Plaintiffs assert that the existence of defendants' "joint enterprise" — *i.e.*, Alameda County's contract with LCA to provide an electronic-monitoring program as an alternative to incarceration — in and of itself violates plaintiffs' due process rights because LCA's decisions regarding who to "violate" and who to keep out of jail are based on a profit motive, not a neutral assessment of whether or not someone has complied with the conditions of release. Plaintiffs further argue that LCA, a private company, has an inherent conflict of interest in imposing supervision fees because it needs those fees to turn a profit. Because due process "entitles a person to an impartial and disinterested tribunal in both civil and criminal cases," *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980), plaintiffs argue that Alameda County violated due process by entering into an agreement whereby "a defendant-funded criminal justice system [is] run by a for-profit corporation" (Dkt. No. 30 at 10). This order disagrees.

Alameda County's contract with LCA is specifically permitted by Section 1203.016 of the Penal Code, which provides that Alameda County "may administer a home detention program pursuant to written contracts with appropriate public or private agencies or entities to provide specified program services." The Penal Code also provides procedural safeguards. If an individual and LCA cannot "come to an agreement regarding the person's ability to pay, or the amount that is to be paid, or the method and frequency with which payment is to be made . . . the court shall then resolve the disagreement." Cal. Penal Code § 1208.2(h). Moreover, although plaintiffs allege that LCA sent the criminal court notices of plaintiffs' "non-compliance," nowhere do they allege that these notices resulted in criminal consequences. The ultimate

8

decision regarding an individual's deprivation of property or liberty remained with a neutral decision maker, not LCA employees.

In any event, plaintiffs fail to allege that a due process violation resulted from Alameda County's policies or customs as required by *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). Under *Monell*, a municipality may be liable when a municipal policy causes an employee to violate another's constitutional right. *Id.* at 690–91. A plaintiff can establish a *Monell* claim by "showing a longstanding practice or custom which constitutes the standard procedure of the local governmental entity." *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005). Plaintiffs claim that contracting with a private company to provide electronic monitoring in and of itself caused plaintiffs' alleged constitutional deprivations. Yet according to the contract, LCA had an obligation to reduce individuals' fees if they lacked the ability to pay. The contract also required LCA to "observe and comply with all applicable laws, ordinances, codes and regulations of governmental agencies, including federal, state, municipal, and local governing bodies, having jurisdiction over the scope of services" (Compl. ¶ 98, Exh. 1 at 8).

Nor have plaintiffs sufficiently alleged a *Monell* claim based on a failure to train, which requires a showing that Alameda County was deliberately indifferent "to the rights of persons with whom the [local officials] come into contact." *Merritt v. County of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989). Deliberate indifference, in turn, requires a showing that Alameda County had actual or constructive notice that its failure to train would likely result in a constitutional violation. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1145 (9th Cir. 2012). This order rejects plaintiffs' unsupported contention that Alameda County was deliberatively indifferent to (or had constructive knowledge of) due process violations based solely on LCA's status as a for-profit corporation. Contrary to plaintiffs' assertion in their brief that LCA's violations could have been avoided with effective training, the complaint is devoid of any well-pled allegation plausibly suggesting that Alameda County had notice of extortionate or otherwise unlawful conduct by LCA. Plaintiffs point to their allegation that courts in Alameda County complained that LCA officers were filing too many notices of supervision violations (Compl. ¶

84), but this alone fails to plausibly suggest that Alameda County, a separate entity from the courts, had notice of such conduct. Alameda's motion to dismiss plaintiffs' due process claim is **GRANTED**.

### B. Claims against Probation Chief Still.

Plaintiffs have also brought their constitutional claims against defendant Still, the chief probation officer for Alameda County. Supervisor liability under Section 1983 exists when the supervisor was personally involved in the constitutional deprivation or there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). The requisite causal connection can be established "by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207–08 (internal citations, quotation marks, and brackets omitted).

Plaintiffs allege that Probation Chief Still was responsible for oversight of the LCA contract and "resolution of program non-compliance issues," and that the LCA contract "itself amounts to a violation of procedural due process protections" (Compl. ¶ 64, Exh. 1 at 21; Opp. at 24). For the reasons above, plaintiffs have failed to allege that the existence or implementation of the LCA contract violated plaintiffs' rights to due processor equal protection. Accordingly, the complaint fails to show a causal connection between Probation Chief Still's conduct and any constitutional violation. The Alameda defendants' motion to dismiss the Section 1983 claims against Probation Chief Still is **GRANTED**.

### C. Claims against LCA Defendants.

To state a claim under Section 1983 of Title 42 of the United States Code, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged deprivation was committed by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Even assuming plaintiffs have adequately alleged that the LCA defendants acted under color of state law, plaintiffs' opposition to the LCA defendants' motion to dismiss makes clear that their due

10

process and equal protection claims are based on the same theories as the constitutional claims asserted against Alameda County. As explained above, plaintiffs have failed to state a cognizable claim for a violation of their due process or equal protection rights. The motion to dismiss plaintiffs' constitutional claims against the LCA defendants is accordingly **GRANTED**.

### 4. RICO CLAIM.

Plaintiffs' RICO claim is brought solely against the LCA defendants. The elements of a civil RICO claim are as follows: "(1) conduct; (2) of an enterprise; (3) through a pattern (4) of racketeering activity (known as 'predicate acts'); (5) causing injury to plaintiff's 'business or property.'" *Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (citation omitted). "Racketeering activity" is defined as a number of specific criminal acts under federal and state laws. *See* 18 U.S.C. § 1961(1). Here, plaintiffs base their RICO claim on the predicate crimes of (a) extortion in violation of the Hobbs Act (18 U.S.C. § 1951), (b) extortion in violation of California law (Cal. Penal Code §§ 518, 519), (c) extortion in violation of the Travel Act (18 U.S.C. § 1952), and (d) wire fraud (18 U.S.C § 1343).

#### A. Wire Fraud.

Plaintiffs have failed to allege predicate acts of wire fraud. The wire fraud statute contains three elements: (a) the formation of a scheme to defraud, (b) the use of interstate wires in furtherance of that scheme, and (c) the specific intent to defraud. *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). "'[C]ircumstances constituting fraud' must be pleaded with particularity; that is also the case when alleged fraud forms the predicate acts." *Bitton v. Gencor Nutrientes, Inc.*, 654 Fed. Appx. 358, 363 (9th Cir. 2016) (citing FRCP 9(b)). Plaintiffs argue that the complaint's allegations plausibly suggest that LCA case managers "systematically withheld information, lied, or fabricated unauthorized requirements in an effort to make it virtually impossible for participants to get a rate they could afford" (Dkt. No. 29 at 3). This order disagrees. Plaintiffs point to various allegations, none of which gives rise to a claim for wire fraud.

*First*, the complaint alleges that when plaintiffs began electronic monitoring, their respective case managers imposed a high daily fee despite knowing that the fee amounted to

11

twenty percent (Edwards), ninety-nine percent (Brooks), and fifty percent (Jackson) of plaintiffs' respective personal daily incomes (Compl. ¶¶ 152–53, 182–83, Exh. 5). Plaintiffs fail to explain, however, how charging a large portion (or all) of a participant's personal income for electronic monitoring gives rise to the inference that LCA and/or its employees had a specific intent to defraud. Although charging such high sums may violate Section 1208.2(f)'s requirement that such fees "be based on the person's ability to pay," the complaint does not contain facts plausibly suggesting that the case managers *intended* to charge more than Section 1208.2(f) permitted or that LCA shared plaintiffs' interpretation of "ability to pay." As plaintiffs themselves allege, LCA determined an individual's "ability to pay" based on household income, not personal income.

This order disregards the conclusory allegation that LCA "intentionally deceive[d]" plaintiffs into thinking that their household income, rather than their personal income, determined their ability to pay (Compl. ¶ 13). Plaintiffs' brief also points to Brooks' declaration, where he states that his case manager told him he was "receiving the minimum daily rate." Plaintiffs fail to mention, however, that Brooks' case manager also told him that "LCA would review [his] financial form to confirm [he] would have a low payment" (Compl. Exh. 5 ¶ 8). Taken together, plaintiffs' allegations do not plausibly suggest a specific intent to defraud.

*Second*, plaintiffs argue that the LCA Handbooks and enrollment forms provided to plaintiffs "deceptively stated that failure to pay LCA's monetary demands could promptly result in termination from the program" (Dkt. No. 29 at 4). But plaintiffs selectively quote these documents (which documents are attached to the complaint). The LCA Handbook *actually* states: "Failure to abide by the fee agreement may result in termination from the program. *LCA will work with a participant if there is a change in their financial status while on the program*" (Compl. Exh. 4 at 5) (emphasis added). The enrollment forms stated that "[s]anctions for failure to make timely payments may include termination from the [electronic-monitoring program]," but then quoted Section 1203.016(b)(4) of the Penal Code, which states in relevant part (Compl. Exh. 10 at 4):

12

> The participant shall agree that the correctional administrator in charge of the county correctional facility from which the participant was released may, without further order of the court, immediately retake the person into custody to serve the balance of his or her sentence if . . . *the person willfully fails to pay fees to the provider of electronic home detention services, as stipulated in the agreement, subsequent to the written notification of the participant that the payment has not been received and that return to custody may result*[.]

Citation to the Penal Code does not show a specific intent to defraud.

*Third*, plaintiffs allege that LCA's case managers imposed artificial roadblocks to obtaining a reduced fee, such as telling plaintiffs that they needed to pick up the required documents at LCA's offices, telling Edwards that LCA required original documentary evidence of his household, and referring disputes to supervisors who were either unavailable or denied plaintiffs' requests without explanation. This order disregards plaintiffs' conclusory allegations that LCA imposed these administrative requirements for purposes of defrauding them. Although plaintiffs' brief argues that they could not personally go to LCA's offices to pick up paperwork because of their electronic-monitoring requirements, the LCA Handbooks attached to the complaint explain that plaintiffs could submit their schedules to their case managers on a weekly basis and could request "4 hours of errand time." Moreover, although Edwards' case manager told him that someone would call him with information regarding a reduced rate, that Edwards never received such a call is insufficient to plausibly suggest fraudulent intent (Compl. ¶¶ 159–167, 203). Because plaintiffs have failed to allege facts showing a specific intent to defraud, they have failed to allege that defendants engaged in wire fraud.

### B. Extortion.

Plaintiffs' extortion-based claims under the Hobbs Act, the California Penal Code, and the Travel Act are premised on the theory that LCA wrongfully threatened plaintiffs with revocation if they failed to pay LCA's fees. At most, the complaint alleges that LCA told Wilson and Jackson that they would be remanded into custody if they fell behind on their payments (Compl. ¶ 217, Exh. 9 ¶ 12). With respect to the remaining plaintiffs, however, this theory of racketeering activity is not supported by the factual allegations in the complaint.

13

As to Edwards, the complaint alleges that his case manager submitted an "incident report" when Edwards failed to submit verification of his household income. Although the complaint alleges that LCA submitted this report "to intimidate him into paying the daily rate LCA demanded," the face of the report states that LCA's program "include[d] a sliding scale fee that is adjusted based on a participant's ability to pay," and that Edwards failed to meet his requirement to "submit verification of his household income in order to determine the daily supervision fee" (Compl. Exh. 22). It is simply implausible that filing this report constituted a threat that Edwards would be remanded to custody if he failed to pay. Moreover, the complaint's allegations that "LCA had convinced [Brooks] that he would go to jail if he failed to pay" and that Edwards was "terrified that LCA would return him to jail" are too conclusory to support an extortion claim (Compl. ¶¶ 172, 211).

While improper threats of imprisonment are sufficient at the pleading stage to allege extortion, merely calling plaintiffs to demand LCA's fees is not. In sum, plaintiffs have pled only two instances of a predicate crime of extortion: when LCA told Wilson and Jackson that they would be remanded into custody if they fell behind on their payments. At trial or on summary judgment, additional facts or circumstances may explain away the hard edge of these threats and doom the case. But for now, these allegations are sufficient to state violations of the Hobbs Act and the Penal Code. Plaintiffs claim under the Travel Act, by contrast, nevertheless fails because plaintiffs fail to allege that LCA used "any facility in interstate commerce" to extort funds from Wilson or Jackson. 18 U.S.C. § 1952.

### C. Conduct of SuperCom and the Individual Defendants.

A RICO defendant must "conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs." 18 U.S.C. § 1962(c). "Conduct" here means more than mere participation in the enterprise's affairs. RICO liability only attaches to "those who participate in the operation or management of an enterprise through a pattern of racketeering activity." *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993). Thus, in order for this element to be met, "one must have some part in directing [the enterprise's] affairs." *Id.* at 179. Here, plaintiffs have

14

failed to plausibly allege that SuperCom, Connelly, Borowick, Harrington, Arguello-Ramos or Rivas participated in the alleged racketeering activity.

With respect to SuperCom, LCA's corporate parent, the complaint alleges only that LCA used SuperCom's software and equipment. This lone allegation does not show that SuperCom participated in LCA's alleged extortion scheme. Similarly, there are no allegations as to Borowick and Harrington other than identifying their roles as CFO/COO and executive director, respectively (Comp. ¶¶ 53–54). While the complaint asserts marginally more allegations concerning Connelly — namely that she negotiated and signed LCA's contract with Alameda County in 2013 — these allegations also fail to plausibly suggest she participated in the RICO enterprise's affairs. Finally, although the complaint details plaintiffs' interactions with case managers Arguello-Ramos and Rivas, no facts connect these defendants with the extortionate acts described above.

Essentially conceding their failure to plead facts suggesting the direct involvement of SuperCom, Connelly, Borowick or Harrington, plaintiffs argue that these defendants can be held liable under a *respondeat superior* theory. If an employer benefitted from its employee's RICO violation, traditional principles of *respondeat superior* determine whether the employer is liable for the acts of its employees. While the complaint contains facts plausibly suggesting that some defendants benefitted from LCA's extortionate conduct, an employer is vicariously liable where her employee's acts were committed within the course and scope of employment. *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 775–76 (9th Cir. 2002). Here, however, the complaint fails to allege facts showing that any threats by LCA employees were made at the behest of SuperCom, Connelly, Borowick or Harrington. As currently pled, *respondeat superior* is inapplicable to plaintiffs' RICO claim. While plaintiffs' RICO claim against LCA *itself* may proceed, the motion to dismiss plaintiffs' RICO claim as to the remaining LCA defendants is **GRANTED**.

    **5.**    **ABUSE OF PROCESS CLAIM.**

Under California law, abuse of process requires proof that the "'the defendant (1) contemplated an ulterior motive in using the process, and (2) committed a willful act in the use

15

1  of the process not proper in the regular conduct of the proceedings." *Johnson v. Lucent Techs.*
2  *Inc.*, 653 F.3d 1000, 1011 (9th Cir. 2011) (quoting *Booker v. Rountree*, 155 Cal. App. 4th 1366,
3  1371 (2007)).

4  Plaintiffs allege that LCA filed "incident reports" with the ulterior motive of pressuring
5  them to pay fees they could not afford. For the reasons explained above, the facts surrounding
6  the incident report filed by Edwards' case manager does not plausibly suggest abuse of process.
7  Rather, the incident report informed the superior court that Edwards had not provided
8  documentation needed so that LCA could evaluate whether to impose a reduced fee. Plaintiffs
9  also point to a "progress report" filed in Jackson's criminal case (Compl. Exh. 23). There, the
10 report informed the superior court that Jackson owed fees at the end of his term of electronic
11 monitoring, yet there is no mention (let alone threat) of a probation violation or return to
12 custody. Because plaintiffs have failed to allege facts showing that these reports were filed to
13 scare program participants into paying LCA's fees, they have not alleged a claim for abuse of
14 process. The motion to dismiss this claim is **GRANTED**.

## CONCLUSION

16 For the foregoing reasons, the Alameda defendants' motion is **GRANTED** and the LCA
17 defendants' motion is **GRANTED IN PART AND DENIED IN PART**. This order sustains plaintiffs'
18 RICO claim against LCA. All other claims are dismissed. Under no circumstances should this
19 order be construed as interfering with the conditions of release imposed by Alameda County or
20 the conditions of release imposed by LCA. In sustaining plaintiffs' RICO claim against LCA,
21 this order does not suggest that Edwards should be released from pre-trial detention. Nor does it
22 bless plaintiffs' various allegations regarding the inconveniences associated with electronic
23 monitoring or LCA's restrictions on individuals' use of alcohol or medical marijuana.

24 By **JANUARY 4 AT NOON**, plaintiffs may seek leave to amend the dismissed claims by a
25 motion noticed on the normal 35-day calendar. Plaintiffs must plead their best case. Their
26 motion should affirmatively demonstrate how the proposed amended complaint corrects the
27 deficiencies identified in this order, as well as any others raised in defendants' motions but not
28

16

addressed herein. The motion should be accompanied by a redlined copy of the proposed amended complaint.

**IT IS SO ORDERED.**

Dated: December 14, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE