IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT JACKSON, JAMES BROOKS, and KYSER WILSON, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LEADERS IN COMMUNITY ALTERNATIVES, INC.,<br><br>Defendant.<br>_____ / | No. C 18-04609 WHA<br><br>**ORDER RE MOTION FOR CLASS CERTIFICATION** |

**INTRODUCTION**

In this putative class action under the Racketeer Influenced and Corrupt Organizations Act, plaintiffs move for class certification. For the reasons below, the motion is **DENIED**.

**STATEMENT**

The County of Alameda contracted with defendant Leaders in Community Alternatives, Inc. to provide an electronic-monitoring program, including GPS and alcohol monitoring, for criminal defendants on pre-trial release or home detention. The superior court, the probation department and criminal defense attorneys all referred individuals to LCA's program. Once referred, LCA tracked the participants, provided the necessary equipment, and reported any non-compliance. On average, 112 Alameda County residents participated in LCA's electronic monitoring on any given day. Plaintiffs Robert Jackson, James Brooks, and Kyser Wilson were among those referred to LCA's program. LCA required plaintiffs to sign a "Supervision Fee

Agreement" that imposed a $150 enrollment fee and a commitment to pay $25.50 per day. Plaintiffs allege that they all paid LCA amounts they could not afford because LCA threatened to "violate" them so that they would return to jail if they failed to pay LCA's fee (Compl. ¶¶ 1–4, 47–64, 80–82, 107–25).

Based on the foregoing, plaintiffs assert a RICO claim based on predicate acts of extortion under state and federal law. They seek to certify the following class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3):

> All individuals who have been or will be put on LCA's Electronic Monitoring program by the Alameda County Court system from July 31, 2014, until this litigation is complete, who were threatened with jail by LCA or any of its employees, agents, or representatives.

This order follows full briefing and oral argument. At an evidentiary hearing in May 2019, three former LCA employees testified. Following the evidentiary hearing, the parties submitted supplemental briefing (Dkt. Nos. 68–77, 96–99).

**ANALYSIS**

Certification under FRCP 23(b)(3) is a two-step process. Plaintiffs must first show that the class meets the following four requirements of FRCP 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Plaintiffs must next establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FRCP 23(b)(3). Plaintiffs bear the burden of demonstrating that these requirements are met. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (citation omitted).

To prove their RICO claim, plaintiffs will need to show (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 620 (9th Cir. 2004). To prove a pattern of racketeering activity, plaintiffs must show

that LCA committed at least two predicate offenses within ten years of each other. *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004). Plaintiffs allege that LCA committed predicate offenses of extortion under the Hobbs Act, 18 U.S.C. § 1951, and Section 518 of the California Penal Code, both of which define extortion as obtaining property from another, with his consent, induced by wrongful use of actual or threatened force or fear.

Plaintiffs describe this case as being "about Alameda County allowing a private company . . . to extort money from poor Californians" (Compl. ¶ 1). In an effort to show a pattern of extortionate conduct, plaintiffs submitted "declarations" from seven putative class members wherein they checked boxes indicating the types of statements made to them by LCA employees. For example, a putative class member could indicate whether he was told that he "would be incarcerated if [he] was late on payments or did not make full payments" or was told that he "would or could go to jail if [he] was late on payments or did not make full payments." The survey later allowed the individual to provide "[o]ther comments." Although all seven respondents agreed with counsel's prepared statement that "[they] could not afford the fees LCA charged, but [they] felt coerced to pay and/or that [they] had no choice but to pay because of the consequences of nonpayment that LCA told [them] about," the commonalities end there. Rather, the narrative description of LCA's "threats" vary by individual. For example, Mr. Lackey was told that "if [he] didn't pay [he] would end up back in court," whereas Mr. Childs explained that "LCA threatened [him] with jail or going back to court multiple times." LCA told Mr. Smith, by contrast, that when he was late on payments he "could go to jail[]" (Dkt. No. 55; Hatton Decl. Exhs. 8–14).[1]

Plaintiffs also submitted declarations from five former (and seemingly disgruntled) LCA employees. As these declarations highlight, conversations between these employees and their clients regarding the possibility of jail varied. While Ms. Barrera said that "it was an every day thing to hear case managers tell people they would go to jail if they did not pay," Ms. Ambriz overheard case managers telling clients "that they needed to make their payments because

---

[1] Following a discovery hearing, an order directed LCA to produce contact information for 20 randomly-assigned former LCA clients. Of those twenty clients, plaintiffs' counsel succeeded in contacting nine individuals, seven of which filled out plaintiffs' survey.

3

otherwise they would be terminated from the program and, ultimately, thrown in jail." Ms. Vargas, in turn, stated in her declaration that she "heard clients being told it was either 'this' (comply with LCA) 'or jail' during enrollment as a way to ensure they would make payments in the future" (Hatton Decl. Exhs. 3–7). Because the declarations failed to make clear whether, and the extent to which, LCA employees uniformly communicated the possibility of jail to program participants in connection with a failure to pay, the undersigned judge directed three of the declarants to attend an evidentiary hearing to testify.

During the evidentiary hearing, former-LCA employees Yvette Barrera, Maria Vargas and Claudia Canas spoke to the "fearful tactics" they and other LCA employees used to obtain payments. The context and wording of the "threats" the former employees purportedly made varied. For example, Ms. Barrera testified that she and other LCA employees "would tell the clients that we had to do an Incident Report and we would tell them that if they didn't make a payment, they would have to go back to jail." Ms. Barrera was directed by her superiors to "Just send an Incident Report. Tell them what could happen, and that was going back to jail." She also explained that she used these "fearful tactics" with "starting clients only" (Tr. at 6:15–17, 11:17–12:12).

Ms. Vargas, in turn, testified that if her LCA clients "refused to give a payment" or were "completely non-compliant" then she would tell them "it would be this or jail." She elaborated that if after multiple warnings the participant still failed to pay, she would send a violation report to the client and the court and "take the bracelet back off and basically that would mean them going back to jail in that sense." Ms. Vargas explained that when she told participants that she would be writing an incident report, "clients would freak out because they knew so many Incident Reports coming back to a judge would mean, like, oh, I'm not doing what I'm supposed to be doing, which means could result in jail." She later described this same tactic as telling clients "they are going to go to jail if they don't follow through." At other times, she described these advisements regarding the possibility of jail as "friendly" (Tr. at 45:11–47:11, 64:6–13).[2]

---

[2] In addition to sending the incident report to the court, a copy would also be sent to the participant's attorney (Tr. at 52:12–16).

4

Finally, Ms. Canas testified that she observed LCA employees "threatening" and "instill[ing] fear" during initial intake meetings with program participants (Tr. at 76:19–77:2):

> I believe something along the lines if a client asked, well, what would happen if the fees aren't up to date. And they were instructed that a Violation Report gets sent out to their jurisdiction. So it could have been the county in Oakland, but personally for myself, because I was in Marin, it was to the parole board and it was depending upon them how they would determine that. But it was always with — the possibility of going to jail was always adamant about that. It was always at the front force of it.

Ms. Canas further explained that the "possibility of jail time" was something that program participants "were always told." When defense counsel asked Ms. Canas "the difference in [her] mind between a threat and a consequence," she responded, "[a] threat is something that you're constantly reminding the person of. A consequence is something you only say once." She denied telling a client "If you don't pay this fee, you're going to jail," explaining that she would instead say, "You are aware that if your fees aren't brought to date the possibility of jail time is there for you" (Tr. at 77:5–78:12, 89:5–9, 91:7–13).

This evidentiary record demonstrates that maintaining a class action under FRCP 23(b)(3) is inappropriate in this case. It is undisputed that no formal training or policy required or encouraged LCA employees to threaten putative class members. Nor were any allegedly extortionate threats made in writing. Rather, plaintiffs' RICO claim is premised on allegations that LCA employees orally and *wrongfully* threatened putative class members with jail if they failed to pay LCA's fees. Yet LCA clearly does not engage in extortion merely by demanding fees properly owed under its electronic-monitoring program. As currently defined, however, the proposed class includes not only individuals who were "threatened with jail" when they *could not* pay, but also includes individuals who were "threatened with jail" when they *would not* pay. Indeed, while the complaint describes this case as being about Alameda County allowing LCA "to extort money from poor Californians," Alameda County participants have a wide-range of income levels (Essex Decl. ¶ 18; Crandall Decl. ¶ 30).

It is also undisputed that LCA employees do not engage in extortion simply by informing participants that they will submit an incident report to the court if the individual fails to comply with the program's requirements. Jail is a potential sanction that a court may impose if an

individual willfully refuses to pay their fees, *see* Cal. Penal Code § 1203.016(b)(4), and plaintiffs' counsel has rightfully conceded that LCA has an ethical obligation to inform program participants that a possible consequence of nonpayment is returning to jail (Tr. at 103:11–22). A key issue at trial will accordingly be whether LCA employees referenced the possibility of jail as an appropriate advisements of the program's requirements or, rather, as an extortionate threat made to wrongfully instill fear and profit LCA. At most, the testimony presented at the evidentiary hearing could provide a common method of proving that LCA employees had an Alameda County-wide practice of acting as bill collectors and reminding clients that they might go to jail if they failed to pay. This does not, however, amount to a common method of proving a pattern of extortionate threats in the furtherance of a RICO enterprise.

Even with the testimony of former LCA employees and clients, resolving plaintiffs' RICO claim will require individualized inquiries into the circumstances surrounding oral communications between LCA employees and putative class members. Relevant circumstances include whether LCA employees said that jail would certainly follow non-payment or whether they merely referenced jail as a possible sanction within the court's discretion. Also relevant is whether the communication followed a putative class member's failure to pay because of valid financial constraints, or whether jail was invoked after a willful failure to adhere to LCA's program. Yet another relevant circumstance will be the timing of LCA's advisement regarding jail. Ms. Canas explained that she referenced the possibility of jail when a new participant asked her what would happen if he failed to pay LCA's fees. In Ms. Canas's view, it was appropriate to advise new participants about the possibility of jail if they failed to adhere to the program, but that the advisement became a threat once LCA "constantly remind[ed] the person" about it. Ms. Barrera, however, explained that she only used "fearful tactics" with "starting clients." Even the tone of a statement could be relevant to the extortion inquiry. While Ms. Barrera described "scaring" program participants, Ms. Vargas said that advisements regarding jail were sometimes "friendly." These individualized issues would predominate at trial.

Plaintiffs' non-binding authorities are distinguishable. In *McMahon Books, Inc. v. Willow Grove Association*, 108 F.R.D. 32 (E.D. Pa. 1985) (Judge Donald VanArtsdalen), the

tenants of a shopping mall sued the owners and operators of the mall to recover alleged overcharges in connection with the plaintiffs' leases. Although the plaintiffs succeeded in obtaining class certification on a RICO claim, that claim was predicated on mail fraud, not oral threats. *Id.* at 39. Although the plaintiffs also alleged oral misrepresentations, the record showed that the oral misrepresentations "appear[ed] to be similar for each tenant." *Id.* at 37. And in *In re U.S. Foodservice Inc. Pricing Litigation*, 729 F.3d 108, 112 (2d Cir. 2013), the plaintiff-customers alleged that a large food distributor had engaged in a fraudulent overbilling scheme in violation of RICO. In upholding the district court's certification of the RICO claim based on mail fraud and wire fraud, the appellate court explained that uniform misrepresentations had been made to all class members and the claim was therefore susceptible to generalized proof. *Id.* at 118. Here, by contrast, there is no uniformity in how "threats of jail" were made to putative class members.

Finally, at oral argument plaintiffs' counsel referenced an instance in which a district court certified an extortion-based RICO claim. *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223 (C.D. Cal. 2003) (Judge Robert Timlin). Notably, however, a later decision in that same case decertified the RICO claim for class treatment. As *Westways* explained, "[c]lass certification for an extortion claim is only viable if it is susceptible to class-wide proof," yet a determination of the defendant's liability for extortion would "require 'a fact-intensive inquiry' into [the defendant's] legal and contractual relationship" with each putative class member to determine whether the relevant conduct amounted to extortion. *Westways World Travel, Inc. v. AMR Corp.*, No. 99-cv-00386, 2005 WL 6523266, at *8 (C.D. Cal. Feb. 24, 2005) (Judge Robert Timlin), *aff'd*, 265 Fed. Appx. 472 (9th Cir. 2008). Similarly, here, plaintiffs' own evidence demonstrates that determining whether or not a "threat" by LCA was, in fact, unlawful extortion will require a fact-intensive inquiry into each LCA employee's relationship with the particular putative class member.

For the reasons explained above, plaintiffs have failed to carry their burden under FRCP 23(b)(3) of showing that common issues of fact or law will predominate in resolving their RICO claim. The motion for class certification is accordingly **DENIED**.

7

**CONCLUSION**

For the foregoing reasons, plaintiffs' motions for class certification is **DENIED**. This case will proceed to trial as scheduled on an individual basis.

**IT IS SO ORDERED.**

Dated: June 6, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE